IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHINONYEREM OSUAGWU,

    **Plaintiff,**

**vs.**                                       **No. 11cv1 MV/SMV**

**GILA REGIONAL MEDICAL
CENTER, JOHN DOE, and JANE DOE,**

    **Defendants.**

<u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Gila Regional Medical Center's *Motion for Summary Judgment*, filed August 8, 2011 [Doc. 57]. Having considered the record and undisputed facts, the parties' briefs, and the applicable law, I will deny the motion.

Pro se Plaintiff Dr. Chinonyerem Osuagwu sued Gila Regional and several individuals[1] under 42 U.S.C. § 1983 for damages and injunctive relief, alleging violation of his due-process rights, defamation, and intentional infliction of emotional distress. He alleges that Gila Regional, through the actions and conduct of Don White (the Chairman of its Board of Trustees); Dr. Jean Remillard (its Chief Medical Officer); the individual members of its internal Peer Review

---

[1] The Court recently granted Plaintiff's motion for leave to amend his complaint to add the named individuals referred to in his original complaint and some additional allegations. *See* Doc. 86. Perhaps in anticipation that the Court would grant the motion to amend, both parties cited to some of the exhibits attached to Plaintiff's motion to amend and his reply in support of their arguments related to summary judgment. Gila Regional's motion for summary judgment is not mooted by the filing of the amended complaint because it includes the new Defendants in its arguments, contending that "GRMC, and any person acting as a member of the professional review body, is immune from suit under [HCQIA] . . . ." Doc. 57 at 1. The Court notes, however, that, according to the allegations in the second amended complaint, Dr. Ronald Dehyle, a physician whom Gila Regional hired to conduct an independent outside review, did not engage in any of the peer-review actions set forth in this opinion or in the amended complaint, and his findings were not submitted to Gila Regional until after the Board had issued its final order imposing the permanent sanctions and discipline, thus it cannot be said that the Board relied on his opinions in imposing its sanctions.

Committee ("PRC"); the members of its Medical Executive Committee ("MEC"); the members of

its Fair Hearing Committee ("FHC" or "panel"); and Ronald Dehyle[2], an Outside Peer Reviewer,

violated his civil rights when, without a reasonable belief that their actions were warranted by

known facts, without a reasonable effort to obtain facts, and without following the process due to

Plaintiff, the MEC and Board of Trustees temporarily and then indefinitely suspended his medical

privileges and imposed harsh requirements for regaining those privileges, and Dr. Remillard filed

notice of that adverse action with the National Practitioner Databank and the New Mexico Medical

Board.  Plaintiff also contends that the Defendants have tortiously damaged his reputation and

intentionally inflicted emotional distress.  The basis of Gila Regional's motion for summary

judgment is that it, its committees, and all of the individual defendants, are "immune from suit under

the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101–11152 and the Review

Organization Immunity Act (ROIA), NMSA 1978 §§ 41-9-1 to -7."[3]  Doc. 57 at 1.

---

[2] It is unclear how the outside expert's opinion was ever utilized.  Gila Regional states that the Board did not send any cases to Dr. Dehyle until February 2, 2009, _after_ it had decided to take negative action, Doc. 57 at 10, and the record indicates that Dr. Dehyle did not conduct his review until February 6, 2009, long after the fair hearing and two days after the Board of Trustees finally voted to permanently suspend Plaintiff's privileges.  _See_ Doc. 44, Exs. M1, M2, M5-M13; Doc. 46, Exs. M3, M4.

[3] The Defendant devoted only two short paragraphs of its brief to discussion of the New Mexico Act, thus I will do the same.  Because I conclude as a matter of law that the Defendants' actions were not reasonable under HCQIA, and the applicable sections regarding qualified immunity under New Mexico's Review Organization Immunity Act ("ROIA") similarly grants qualified immunity only if the peer-review individual or entity "act[ed] in the reasonable belief that [its] actions or recommendations [were] warranted by the facts known to [it] after reasonable efforts to ascertain the facts is made," NMSA 1978 §§ 41-9-2, -4, I reach the same conclusion that the Defendants are not entitled to qualified immunity under the New Mexico Act.

## I.        APPLICABLE LEGAL STANDARDS.

Under HCQIA, any health-care entity that takes final peer-review action[4] that adversely affects a physician's hospital privileges for a period longer than thirty days must report that final action to the state board of medical examiners.  *See* 42 U.S.C.A. § 11133(a)(1).  The board of medical examiners must then report this information to the National Practitioner Data Bank.  *See* 45 C.F.R. § 60.11(b).  The HCQIA also "provide[s] qualified immunity from damages actions for hospitals, doctors and others who participate in professional peer review proceedings."  *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10th Cir. 1996).  "[A] peer review participant is immune from private damage claims stemming from the peer review action" if the peer-review action meets certain standards specified by Congress."  *Id.*   Qualified immunity on the issue of damages is provided if the peer-review action was taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

---

[4]   "The term 'professional review action' means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.  Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action."  42 U.S.C. §11151(9).

> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a).  But, unlike qualified immunity under 42 U.S. § 1983, HCQIA immunity is "immunity from liability only," not immunity from suit.  *Decker v. IHC Hosps., Inc.*, 982 F.2d 433, 436 (10th Cir. 1992); *Summers v. Ardent Health Serv., L.L.C.*, 150 N.M. 123, __, 257 P.3d 943, 949 n.3 (2011) ("HCQIA does not provide immunity from suits for injunctive or declaratory relief."); 42 U.S.C. § 11111(a)(1) (limiting immunity to liability "in damages").  "HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed."  *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1332 (11th Cir. 1994).  Thus, if the evidence is undisputed,

> a court might determine at an early stage of litigation that the defendant has met the [section 11112(a) ] standards, even though the plaintiff might be able to demonstrate that the professional review action was otherwise improper.  At that point, it would be in order for the court to rule on immunity.  In such a case, the court could still proceed to determine whether injunctive, declaratory, or other relief would be in order.

*Id.* at n.24 (citing H.R.Rep. No. 903, at 12, reprinted in 1986 U.S.C.C.A.N. at 6394).

Section 11112(b) of HCQIA more fully defines the minimum "adequate" notice and hearing procedures referred to in § 11112(a)(3).  This subsection provides:

> A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

> (1) Notice of proposed action

> The physician has been given notice stating--

> > (A)(i) that a professional review action has been proposed to be taken against the physician,

> > (ii) reasons for the proposed action,

4

(B)(i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating--

(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B)--

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)--

(i) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician involved has the right--

(i) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may

be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of the hearing; and

(D) upon completion of the hearing, the physician involved has the right--

(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.

42 U.S.C. § 11112(b).  In addition, HCQIA

confers immunity on any person who makes a report to the National Practitioner Data Bank 'without knowledge of the falsity of the information contained in the report.' 42 U.S.C. § 11137(c) (1994).  Thus, immunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false.

*Brown*, 101 F.3d at 1334.

When a defendant asserts HCQIA immunity in a motion for summary judgment, there is an "unconventional twist to the burden of proof in our summary judgment standard," *Sugarbaker v. SSM Health Care*, 190 F.3d 905, 912 (8th Cir. 1999), because HCQIA expressly entitles the defendants to a rebuttable presumption that the peer-review proceedings satisfied all four requirements of § 11112(a)(1)-(4) "unless the presumption is rebutted by a preponderance of the evidence," § 11112(a).  Thus, in resolving Gila Regional's motion for summary judgment, while reviewing the evidence in a light most favorable to Plaintiff, I must determine whether he has

"satisfied his burden of *producing* evidence that would allow a reasonable jury to conclude that [Gila Regional's] peer review disciplinary process failed to meet the standards of HCQIA." *Bryan*, 33 F.3d at 1334 (internal quotation marks omitted) (italics added); *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 839 (3d Cir. 1999) (accord). Another way of stating the summary-judgment standard is: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" *Bryan*, 33 F.3d at 1334 (internal quotation marks omitted). If so, even if the Defendants rely on a medical expert who opines that their actions were reasonable, the Plaintiff will be allowed to proceed to trial to see if a jury will "find, by a preponderance of the evidence, the peer review action was not" reasonable. *Brown*, 101 F.3d at 1333 (holding that "the district court did not err in failing to find [the defendants] immune, as a matter of law, from damages stemming from the revocation of [the physician's] obstetrical privileges"). As the Tenth Circuit noted, "to remove a plaintiff's claims from the jury simply because 'a difference of opinion among experts' exists would abrogate the jury's responsibility to weigh the evidence and determine the credibility of witnesses." *Id.* at 1334 n.9. Thus, when resolving a summary-judgment motion on the issue of HCQIA immunity, "in determining whether a peer review participant is immune under [HCQIA], the proper inquiry for the court is whether [the physician] has provided sufficient evidence to permit a jury to find she has overcome, by a preponderance of the evidence, any of the four statutory elements required for immunity under 42 U.S.C. § 11112(a)." *Id.* "Courts apply an objective standard in determining whether a peer review action was reasonable under 42 U.S.C. § 11112(a)." *Id.* at 1333.

Of course, what minimum procedural process is due under HCQIA must also be adjudged in light of constitutional due-process protections. The Eleventh, Sixth, and Fifth Circuits have explicitly held that a physician has a constitutionally-protected property interest in medical-staff

privileges where the hospital's bylaws detail an extensive procedure to be followed when corrective

action or suspension or reduction of these privileges is going to be taken.  *See Shahawy v. Harrison*

, 875 F.2d 1529, 1532 (11th Cir. 1989) (holding that a physician has a "constitutionally-protected

property interest in medical staff privileges"); *Yashon v. Hunt*, 825 F.2d 1016, 1022-27 (6th

Cir.1987); *Northeast Ga. Radiological Assoc. v. Tidwell*, 670 F.2d 507, 511 (5th Cir. Unit B 1982)

("Medical staff privileges embody such a valuable property interest that notice and hearing should

be held prior to [their] termination or withdrawal, absent some extraordinary situation where a valid

government or medical interest is at stake.").  The Tenth Circuit has noted this property interest in

at least one case in which the parties conceded the interest exists.  *See Setliff v. Mem'l Hosp. of*

*Sheridan County*, 850 F.2d 1384, 1395 (10th Cir. 1988).  The Defendants have not challenged

Plaintiff's right to constitutional due process either in this summary-judgment motion or in their

previous motion to dismiss, and the time for filing further pre-trial motions has expired.

> Ordinarily, "one who has a protected property interest is entitled to some sort
> of hearing before the government acts to impair that interest, although the hearing
> need not necessarily provide all, or even most, of the protections afforded by a trial."
> *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1220 (10th Cir. 2006) (citing
> *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L. Ed. 2d 18 (1976)).
> "[D]ue process is flexible and calls for such procedural protections as the particular
> situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L.
> Ed. 2d 484 (1972).  The Supreme Court has repeatedly held, "where a State must act
> quickly, or where it would be impractical to provide predeprivation process,
> postdeprivation process satisfies the requirements of the Due Process Clause."
> *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S. Ct. 1807, 138 L. Ed. 2d 120 (1997).
> Furthermore, "[a]n important government interest, accompanied by a substantial
> assurance that the deprivation is not baseless or unwarranted, may in limited cases
> demanding prompt action justify postponing the opportunity to be heard until after
> the initial deprivation."  *Id.* at 930–31.

> "In matters of public health and safety, the Supreme Court has long
> recognized that the government must act quickly.  Quick action may turn out to be
> wrongful action, but due process requires only a postdeprivation opportunity to
> establish the error."  *Camuglia*, 448 F.3d at 1220 (citing *North American Cold*
> *Storage Co. v. City of Chicago*, 211 U.S. 306, 315, 29 S.Ct. 101, 53 L.Ed. 195

(1908)).

> The discovery that a physician constitutes an imminent danger to public safety is precisely the kind of circumstance where the government must act quickly.

*Guttman v. Khalsa*, ___ F.3d __, __, 2012 WL 76055, *8-*9 (10th Cir. 2012).

## II.   UNDISPUTED FACTS AND ANALYSIS

Plaintiff contracted with Gila Regional to provide obstetrical/gynecological services in February 2008. He worked in an obstetrical/gynecological practice with Dr. Nwachuku, who was the head of obstetrics at Gila Regional. It appears that the MEC at Gila Regional consisted of Dr. Michael Sargent, who was its acting Chief of Staff[5], Dr. Remillard, who was its Chief Medical Officer, Dr. Carreon, Dr. Koury, and Dr. Montoya, a retired gynecologist who was also a member of the Board of Trustees (and who also attended the peer review meetings). *See* Doc. 44, Ex. R at 4-8 (Tr. of Dec. 15, 2008 Fair Hearing).

Under Gila Regional's bylaws, upon the request of the CEO, Board of Trustees, or its Chief of Medical Staff, the MEC may authorize an immediate, maximum 14-day summary suspension of any physician when "the failure to take such action may result in imminent danger to the health of any individual *and* otherwise be in the best interest of patient care at [Gila Regional]," during which time the hospital would investigate to determine the need for permanent action. Doc. 44, Ex. J at 1, ¶ 7.2-1. Within the following 5 days, the MEC is mandated to "interview the practitioner affected by the summary suspension," and to inform him of its specific basis, including a written statement and summary "of at least one or more particular incidents giving rise to the assessment of imminent danger" "demonstrating that failure to suspend could have reasonably resulted in an imminent

---

[5] On November 17, 2008, the Chief of Staff was Dr. Twana Sparks, but she had been replaced by Michael Sargent by November 24, 2008. *See* Doc. 57, Exs. 1, 2.

danger to the health of an individual." *Id.* at 1-2, ¶ 7.2-2. The bylaws expressly require the suspended practitioner "to be given an opportunity to discuss, explain, or refute the facts that made the basis of the suspension." *Id.* at 2, ¶ 7-2-2. Within 10 days of the suspension, the MEC is required to report its findings, and if it finds that a failure to modify or continue the suspension may result in imminent danger, it must notify the doctor and provide a formal fair hearing as required by section 8 of the bylaws. *Id.*, ¶ 7.2-3. The notice of hearing is required to state "the acts or omissions with which the practitioner is charged, a list of specific or representative charts questioned, and/or the other reasons or subject matter that was considered in [the MEC] making the adverse recommendation . . . ." *Id.* at 5, ¶ 8.3-2. The MEC appoints a representative at the fair hearing, who bears the burden to "present appropriate evidence in support of the adverse recommendation." *Id.* at 8, ¶ 8.5-8. The suspended physician has the right to "challenge any witness, [and] to rebut any evidence." *Id.* ¶ 8.5-9. The hearing may be recessed and reconvened for the participants' convenience or for the purpose of "obtaining new or additional evidence or consultation," and after all of the presentation of evidence, the hearing is concluded and closed for the purposes of deliberation "outside the presence of the practitioner." *Id.* ¶ 8.5-10. Within 30 days of the adjournment of the hearing, the FHC panel prepares a recommendation for the Board of Trustees to either continue, modify, or drop the suspension. *See id.* ¶ 8.5-11. The MEC also must make a recommendation to the Board of Trustees to accept or deny the FHC's recommendation within 45 days of the adjournment of the hearing, *id.* at 9, ¶ 8.5-12, and the physician also may similarly prepare a written statement that discusses the facts and recommendations with which he disagrees, which must become part of the record of the fair hearing that is presented to the Board, *id.* ¶ 8.5-13. After the 45-day period has passed, the Board then must schedule a public hearing to review the findings and recommendations, which the physician must be allowed to attend. *Id.* ¶¶ 8.6-1, -2. But

the public hearing "shall not be an evidentiary proceeding" and the Board cannot admit or accept any evidence that the FHC panel did not consider unless "it could not have been presented to the hearing committee." *Id.* ¶ 8.6-6. The Board issues its final ruling regarding the suspension after the public hearing.[6]

### A. The events instigating the initial 14-day suspension of laparoscopic privileges.

On November 17, 2008 after a "Special [MEC] meeting," of which Plaintiff was completely unaware, based on "complications from two diagnostic laparoscopic procedures," the MEC summarily but temporarily suspended Plaintiff's privileges to perform elective laparoscopic procedures for 14 days, and required Dr. Nwachuku to assist Plaintiff on emergency laparoscopies during that 14-day period. Doc. 57, Ex. 1. In violation of Gila Regional's Bylaws, *supra*, the notice of suspension did not specify which laparoscopic procedures were in question, nor did the MEC ever

---

[6] Thus there were six negative peer-review actions in this case: 1. The MEC's November 17, 2008 14-day summary suspension of Dr. Osuagwu's privileges to perform elective laparoscopic procedures, and requirement that Dr. Nwachuku assist Plaintiff on all emergency laparoscopies during that 14-day period, pending investigation, for which Plaintiff did not receive any pre-suspension notice or hearing. 2. The PRC's November 22, 2008 recommendation that the MEC continue the suspension of laparoscopic procedures. 3. The MEC's November 24, 2008 indefinite suspension of <u>all</u> gynelogical surgical privileges and imposition of a requirement that he obtain consultations for all obstetrical patients who had complications, also made without pre-suspension notice or hearing. 4. The FHC's December 22, 2008 recommendations that the MEC "restore [Plaintiff's] Gynecology privileges except for the laparoscopic lysis of adhesions, institute ongoing focused chart review for [Plaintiff's] obstetric and gynecologic cases, mandate additional education for [Plaintiff] with regard to the indications for and techniques of laparoscopic lysis of adhesion, and require additional education for [Plaintiff] focused on risk management and medical records documentation." 5. The MEC's December 30, 2008 final indefinite suspension, imposed after the FHC hearing, in which the MEC continued the indefinite suspensions and requirements imposed on November 24 and also instituted "focused chart reviews" for all of Dr. Osuagwu's obstetrical patients; required 6 hours of CME within 6 months; and required Dr. Osuagwu to obtain "additional education with regard to the indications for and techniques for all gynecological surgery and receipt of information from an educator that Dr. Oswaguwu is competent to practice in a small town." 6. The Board's February 4, 2009 permanent adoption of the MEC's December 30, 2008 recommendations and suspensions. *See* Doc. 57, Exs. 1, 2, 4; Doc. 44, Ex. W at 2 (44-3 at 8); Doc. 44, Ex. N at 1 (44-1 at 23); Doc. 57 at 4, ¶ 8.

interview the Plaintiff regarding the charges against him or the two cases it was considering.  *See id*.; Doc. 44, Ex. R at 31-32.

At the fair hearing, Dr. Carreon, whom the MEC appointed to present its case, explained that the MEC believed that, although the two surgical cases had been "difficult" and "high-risk" ones, "having two complications [from bowel perforations] in the [5 to 6-week period of time] was a little bit over the acceptable limit," and it wanted a Peer Review Committee ("PRC") to further investigate Plaintiff's performance.  Doc. 44, Ex. R at 9-12.  Although not mentioned in its November 17, 2008 notice of suspension, Dr. Carreon also cited a recent instance in which Plaintiff attempted to schedule an exploratory laparoscopy of an obese patient, which was cancelled when the nurse anesthetist refused to administer anesthesia.  *See id.* at 6-8.  It was this third event that actually instigated the MEC's summary-suspension action.  *See id*.; *id.* at 11-12.  As noted, it is undisputed that, contrary to the Bylaw's requirements and the usual procedure at Gila Regional, neither the MEC nor the PRC interviewed or otherwise question the Plaintiff about these three cases before or during the initial 7-day suspension or during the subsequent indefinite extension and expansion of Plaintiff's suspension during the three weeks before the fair hearing.  *See id.* at 31-32. At the fair hearing, although he was not a "voting member" of the PRC, Dr. Remillard justified the departure from the required procedure, stating "we [the PRC] felt that the magnitude of the threat to the public was such that we needed to take immediate action.  And so we moved very, very swiftly to present it to the appropriate bodies, in this case the MEC, to say, no, we really need to suspend."  *Id.* at 32.  Except for Plaintiff's comments given at the fair hearing noted below, the following is a summary of the three cases based on the hospital records before the MEC and PRC.

Case 10[7] - #41872.  On August 8, 2008, Plaintiff and Dr. Nwachuku, as the primary surgeon, had performed a laparotomy to remove a ruptured ectopic pregnancy on an obese patient.  *See* Doc. 44, Ex. R at 93-94; Doc. 63 at 3-4.  She returned to the hospital on September 2, 2008 with a fever and a high white-blood-cell count, and a CT scan found "inflamed adipose tissue." Doc. 44, Ex. R at 94, 101.  After treatment with antibiotics did not lessen her severe pain, because he thought the patient may have developed adhesions at the laparotomy site[8], Plaintiff performed an "exploratory laparoscopy with lysis of adhesions" on September 4, 2008.  Doc. 44, Ex. R. at 94, 96, 99.  The patient's white-blood-cell count subsequently rose from 12,000 on September 4th to 15,000 on September 5, and continued to rise to 23,000 on September 6.  *See id.*  at 108.  Plaintiff ordered a second, post-laparoscopy CT scan late on September 4, which showed some "free air," so Plaintiff consulted with a radiologist, who did not think the "free air" was much to worry about because it could have been introduced during the laparoscopy.  *See id.* at 100-102.  Plaintiff requested pulmonary and internal medicine consults on September 5 after the patient experienced some breathing issues.  *See id.* at 95.  Plaintiff also requested a general surgical consult on September 5, but the surgeon did not suggest there could be a perforated bowel or that she be immediately transferred to a larger hospital.  *See id.* at 97, 110, 115.  When the patient's condition continued to worsen on September 6, and after she experienced some heart issues, Plaintiff asked for the patient to be transferred to UNM hospital on September 7, 2008, where it was determined that her bowel had been perforated.  *Id.* at 94, 100, 104.

---

[7] Case numbers were assigned by the PRC and patient numbers were used for protection of privacy.

[8]   Plaintiff states that he also consulted with Dr. Nwachuku, who concurred in the laparoscopy, *see* Doc. 63 at 4, but he apparently did not document that consultation in the hospital records and the MEC never asked him about the events leading up to the laparoscopy.

After reviewing the hospital chart, according to Dr. Remillard, the only reasons the MEC stated they were initially concerned about this case were what they perceived as "the [un]timeliness of obtaining consultation on this patient" from the general surgeon and the fact that she was not transferred to another hospital until September 7.  Doc. 44, Ex. R at  at 104.  In other words, the MEC apparently did not believe that the Plaintiff's actions had placed this patient in "imminent danger."

Case 7 - # 196208.  Dr.  Nwachuku and Plaintiff operated on this patient in July 2008 to remove an ovarian cyst and her uterus.  *See* Doc. 44, Ex. R at 119-121, 138.  She came back to Plaintiff on November 8, 2008 because of severe abdominal pain, and he performed an exploratory laparoscopy to try and determine the cause of her pain and to remove adhesions, after which she went home.  *See id.* at 116, 119-122.  A few hours later, she returned to the ER with abdominal pain, but Dr. Nwachuku sent her back home after examination.  Two days later, while Plaintiff was out of town, the patient came to the ER and was placed in ICU.  *See id.* at 116, 122.  Dr. Nwachuku and Dr. Wendler, a general surgeon, performed a laparotomy on November 10, during which they discovered two bowel perforations and a large hematoma.  *See id.* at 116.

Case 9 - #76636.  On November 14, 2008, Plaintiff tried to schedule an exploratory laparoscopic procedure on a 45-year-old, obese patient.  This patient had severe, chronic pelvic pain after multiple gynecological and abdominal surgeries by other physicians, including the prior removal of two ovarian tumors and her uterus.  She had been referred to Plaintiff by another doctor to diagnose the cause of her pain.  *See* Doc. 44, Ex. K10 at 3, 5-6.  The patient was taking several medications for asthma, high cholesterol, and high blood pressure, but her blood pressure at the time of admission was normal and she was not currently experiencing any heart, breathing, or swelling issues.  *See id.* at 6.  A sonogram showed a "complex adnexal cystic structure," or mass, in the

14

uterine area.  *See id.*  Before the scheduled surgery, Plaintiff confirmed that Dr. Wendler, a general

surgeon, would be available to assist him, should the need for a laparotomy arise.  *See id.* at 3.  But

the nurse anesthetist "refused to perform the case," opining that the patient was "a high risk status,"

and the head of anesthesiology – who was also the hearing officer for the fair hearing in this case

– cancelled the surgery.  *Id.*; *and see* Doc. 44, Ex. N at 1; Doc. 44, Ex. R at 7-8, 81.  The MEC never

concluded that Plaintiff had put this patient in "imminent danger" by attempting to schedule the

elective exploratory laparotomy.

###### B.  The PRC review and the suspension of all gynecologic privileges.

After its summary suspension of laparoscopic privileges, the MEC asked the hospital's PRC

to review the two cases and provide recommendations.  The PRC consisted of several physicians,

none of whom were gynecologists.  Doc. 44, Ex. R at 37-38.  But Dr. Remillard, who states he was

not a "voting member" of the PRC but otherwise fully participated in the review, allegedly provided

"expert opinion" input at the PRC meetings as a non-practicing gynecologist, *see id.* at 34, 37-38,

as did Dr. Montoya, a retired gynecologist, who was a member of the MEC and Gila Regional's

Board of Trustees.  *See id.*  In addition, either Dr. Carreon or Dr. Remillard informally talked with

some unidentified non-MEC-member physicians (who had been invited to the MEC meetings) who

had previously consulted on some of the Plaintiff's cases, and who allegedly told them that they

"should have seen the patient earlier" in unidentified instances.  *Id.* at 20, 34.  After looking at the

two cases discussed *supra*, and after other, unidentified physicians who performed laparoscopic

procedures allegedly told Dr. Remillard or Dr. Carreon that they had *never* perforated a bowel

during a laparoscopic procedure, the PRC decided to look at not only the Plaintiff's surgical skills,

but also at his other skills to see if there was "a problem with any other kind of cases."  *See id.* at

9-11.

The PRC pulled 34 of Plaintiff's patients' hospital charts, divided them up between "four or five" unidentified physicians for review, *id.* at 29, and the reviewers filled out "Medical Staff QA & I" forms by giving a brief summary of the reviewer's "findings" and "conclusions" regarding each case; answering 8 general questions about the patient's clinical management; and rating it between a 1 and a 5. *See, e.g.*, Doc. 44, Ex. K1 at 1-2. Category 3 cases indicated a "marginal deviation from the standard of care;" category 4 cases indicated "some deviation from the standard of care with possible change of outcome," and category 5 cases indicated "deviation from the standard of care with probable change of outcome.[9]" *See id.* at 2. Although the forms provided for the name and signature of the PRC member who reviewed the hospital chart, all of the forms for Plaintiff's cases were unsigned. At a joint meeting on November 22, 2008, the PRC determined that 12 or 13 of the cases caused them some concern. *See* Doc. 44, Ex. R at 12, 25, 36; Doc. 44, Ex. N at 2. Dr. Carreon testified that the PRC was concerned that the hospital charts indicated deficiencies in "preoperative evaluation[s]," absences of "documented pelvic exam[s]," lack of documentation regarding what "workup" had been done "prior to taking somebody to surgery;" "whether general surgery should have been involved and wasn't," about "hesitating to obtain consultations in patients that were very ill," about the "timeliness of consultations," and about a "diagnosis prior to an operation and the [subsequent] pathology not being consistent." Doc. 44, Ex. R at 13-14, 16, 20,

---

[9] It is difficult for me to understand how a physician who is not a gynecologist could give an opinion on the standard for care for a surgical gynecologist. My concern is supported by Dr. Neely, a member of the FHC panel who stated that, as an ER doctor, he did not feel comfortable trying to determine from his own review of hospital charts whether an obstetrical surgeon had done his job properly, and that he would have to rely on "what's come before . . . and make sure that it wasn't skewed in some unfair way." Tr. of December 15, 2008 hearing at 35 (Doc. 44, Ex. R (44-2 at 10)). Dr. Donnell, an anesthesiologist who was the chair of the FHC panel stated that, "to some degree," relying on the PRC review forms and opinions was "appropriate," even though none of the PRC's anonymous physician reviews and opinions were prepared by surgical gynecologists.

23.  Again, no one asked Plaintiff to appear before the PRC to comment on the cases or provide evidence or explanation during this peer-review process.  *Id.* at 31-32.  But Dr. Carreon testified that unspecified members of the PRC again allegedly informally discussed the cases with unidentified "people that are in that field" who reportedly said, "I would have done this first [or] I would have done that," in arriving at their conclusion that certain cases were concerning.  *Id.* at 12, 14-15.  Although he was never interviewed, Plaintiff was asked at some point to provide written comments or explanations on 1 of the 12 cases that gave the PRC some concern and on several cases that were *not* cause for concern.  *See id.* at 36.  There is nothing in the record evidencing any written recommendations by the joint members of the PRC.  And the MEC presented nothing indicating that any of the cases, other than the single laparoscopic case in which the Plaintiff apparently had perforated the bowel, gave cause to believe that Plaintiff's patients were in "imminent danger."

According to Dr. Remillard, who was involved in the PRC's November 22 meeting, at the PRC's urging, the MEC held an "emergency meeting" on November 24, 2008, at which time the PRC recommended that Plaintiff's "laparoscopic privileges be suspended indefinitely." Doc. 44, Ex. R at 29-31; *see* Doc. 44, Ex. Q.  Although the Amended Complaint states that the PRC "submitted findings in a report to the . . . MEC," Am. Compl. at ¶ 51, that report has not been submitted in the summary-judgment record.  Without explanation in the record, and with no finding of "imminent danger," in violation of the Bylaws, the MEC "broadened [the suspension] to **all** gynecological privileges and also to have mandatory consultation when obstetrical care . . . deviated from normal because of the timeliness of consultation."  Doc. 44, Ex. R at 30; *see* Doc. 57, Ex. 2.  Dr. Carreon stated that the PRC decided to send the charts "to somebody else outside the hospital to have them

reviewed and see what their opinion was, as well."[10]  Doc. 44, Ex. R at 26; Doc. 57, Ex. 2.  The

MEC then informed Plaintiff of its decision to broaden and continue the suspension, but again, the

notice did not inform Plaintiff which charts were under scrutiny or what specific actions he had

taken or not taken that supplied support for immediate, summary suspension of all of his

gynecological privileges, nor did it mention "imminent danger."  Instead, the notice obliquely stated

that "there were a high number of cases in which a change of outcome could have been achieved for

the patients . . . ."  Doc. 57, Ex. 2.  When asked by the FHC panel why Plaintiff was not given the

opportunity to provide input during the whole peer-review process, Dr. Remillard attempted to

justify the failure to do so by stating "we have enough evidence to support those actions, and to

make sure that our public is protected, that [Plaintiff] doesn't have privileges to go back to the OR

and potentially put other patients in harm's way."  Doc. 44, Ex. R at 31-33.  After receiving notice

of the indefinite and expanded suspension, Plaintiff asked for a fair hearing as provided by the

Bylaws.

###    C.  The fair hearing.

The FHC panel consisted of Dr. Remillard, Dr. Russell Kleinman, Dr. Mark Donnell (who

served as the hearing officer), Dr. Adele Lente, and Dr. Bill Neely[11], *see* Doc. 44, Ex. R at 2.  The

fair hearing was held on December 15, 2008.  Dr. Carreon, who was appointed to present the MEC's

case in the absence of Dr. Koury, who was ill, was not prepared to do so.  *Id.* at 4.  Over Plaintiff's

objections and request for specific information about each case in which he was accused of not

---

[10]  The cases were sent to Defendant Dr. Dehyle, but not until February 2, 2009, after the Board had already finally decided to impose the harshest sanctions.

[11]  *See* Doc. 57, Ex. 3; Doc. 44, Ex. W at 2.

meeting a standard of care, *see, e.g. id.* at 15-16, 21-24[12], Dr. Carreon stated that he did not have time to go through each case the PRC had reviewed; thus he simply gave a general summary from his "memory" about what he thought the problems actually were.  *See* Doc. 44, Ex. R at 4-6; *id.* at 16.  Dr. Carreon called no witnesses, experts, or other physicians/consults who had worked with Plaintiff on any of the cases.  After giving the general summary, and summarizing case # 9, regarding Plaintiff's attempt to schedule the diagnostic laparoscopy for the obese patient with asthma issues that had led to the initial suspension and investigation, Dr. Carreon apparently left at the first break, instead of presenting all of the evidence on which the MEC had based its two summary-suspension decisions.  *See id.* at 5-28.

Dr. Remillard then took over questioning the Plaintiff, and finished presenting and arguing the MEC's case, even though a review of the transcript shows that he was never sworn in (in contrast to Dr. Carreon, *see id.* at 5), he was not appointed to present the MEC's case, and he was a voting member of the FHC panel.  *See, e.g., id.* at 29-30, 66-68, 73, 77; Doc. 44, Ex. W at 2. Indeed, Dr. Remillard played roles as Dr. Oswagwu's accuser and "expert witness" against him, by virtue of his involvement in the MEC and PRC committees; as his prosecutor and as an unsworn witness at the Fair Hearing; and as a judge at the Fair Hearing.  Although Gila Regional's Bylaws do not preclude its Chief Medical Officer's involvement in every stage of an investigation, disciplinary sanction, and "fair" hearing to determine if the sanction was appropriate, minimal constitutional due-process standard does preclude involvement to this degree.  "[T]he Due Process

_____

[12]  Plaintiff asked if Dr. Carreon had written down the names of physicians who allegedly told him that Plaintiff's requests for surgical consultations were late, and which cases they were talking about, "because every single thing you say here today has to be backed up by some sort of proof.  We are talking here about my life.  I mean, we can't just throw things around.  If you say that anybody said anything, you have to provide proof of it."  Tr. at 21 (Doc. 44, Ex. R) (44-2 at 7).  Dr. Carreon responded, "I disagree.  I was asked to come and give a summary."  *Id.*

Clause of the Fifth Amendment guarantees a hearing concerning the deprivation of . . . a recognized property or liberty interest before a fair and impartial tribunal.   This guarantee applies to administrative adjudications as well as those in the courts."   *Harline v. Drug Enforcement Admin.* 148 F.3d 1199, 1203 (10th Cir. 1998) (internal citations omitted).   Even in the context of a prison disciplinary hearing,

> [a]n impartial hearing board has been required, to the extent that a member of the board may not participate in a case as an investigating or reviewing officer, or be a witness.   The Third Circuit, . . . has also held, in the context of the federal system where a prisoner whose good time is taken away goes first to a disciplinary committee and then to the Good Time Forfeiture Board, that an associate warden could not sit on both committees.

*Wolff v. McDonnell*,  418 U.S. 539, 572 n.20 (1974); *id.* at 592 (Marshall, J., concurring) ("Due process is satisfied as long as no member of the disciplinary board has become involved in the investigation or presentation of the particular case or has any other form of personal involvement in the case.").   As a matter of law, Gila Regional and its MEC cannot show that it afforded a fair hearing by impartial decisionmakers to Plaintiff when it conducted the disciplinary proceedings in this fashion.

Instead of requiring the MEC to present evidence in support of its two suspensions, the FHC decided to itself go through the charts of the cases that the PRC members had rated to see "what peer review said;" and to allow Plaintiff an opportunity to "explain his perceptions of the cases and discuss them."   Doc. 44, Ex. R at 38.   The question regarding "what peer review said" appears to be contained solely in the "Medical Staff QA & I" forms prepared by various anonymous members of the PRC between November 17 and 22, 2008.   The forms had apparently been given to Plaintiff before the fair hearing so that he could comment in writing on the case and the criticisms.   *See* Doc. 44, Exs. K1-K13; Doc. 44, Ex. R. at 44.   The FHC discussed, however, and the Plaintiff was

permitted to discuss, only the following cases at the fair hearing:

1. Case 8 #65998 - category 5 (reduced to category 4 at the hearing because the FHC panel concluded that the Plaintiff's medical decisions were not questionable under the circumstances). The PRC form stated that the major criticism was the Plaintiff's insufficient documentation regarding what he saw and what he did before deciding to remove an ovary, after which the FHC panel determined that it was not a standard-of-care issue, but rather a documentation issue, *see* Doc. 44, Ex. R at 39-57. But the PRC form also made the statement, "should pt. have had doppler?" even though the PRC reviewer subsequently stated that there was documentation that "clinically pertinent diagnostic tests" had been ordered; and the PRC reviewer questioned whether there "was an [undescribed] avoidable incident that extended the length of stay or compromised the outcome?" Doc. 44, Ex. K11 at 1, 2. The medical records and evidence at the hearing showed that the 15-year old patient had presented to Gila Regional's ER reporting abdominal pain for two weeks and constant, more severe pain for 24 hours. Doc. 44, Ex. R at 39, 47. A CT scan showed "an enlarged abnormal right ovary consistent with torsion and infarction," and a doppler ultrasound report stated that there was no blood flow to the ovary. *Id.* at 39-40; *see also* Doc. 44, Ex. K11 at 5 (radiologist's opinion that, given the long duration of symptoms, "the ovary could be infarcted and necrosed"). After viewing the ovary and seeing, in fact, that it was greatly enlarged and twisted and not receiving proper blood flow, Plaintiff believed that it was infected and not viable, and he removed the ovary laparoscopically. Doc. 44, Ex. R at 47-50, 55. The patient recovered fully and was released from the hospital the next day. *See id.* at 57.

The post-op pathology report stated that, although the ovary was swollen and had a cyst, it was otherwise "relatively normal." *See id.* at 56. At first, Dr. Remillard stated that the PRC Committee was satisfied with Plaintiff's documentation regarding his procedures. *See id.* at 44. The

PRC appeared to be unhappy about the underline outcome because Plaintiff had removed what appeared on pathology to be a non-necrotic ovary in a young woman, thereby negatively affecting her fertility. *See id.* at 40-42. But *after* Dr. Remillard and the other doctor/committee members at the fair hearing agreed that taking the patient to surgery was reasonable and two of the doctors commented that, based on the CT and ultrasound scans, radiology report, enlarged size, and torsion, there was a definite risk of *not* removing the ovary, *see id.* at 45, 46, 49-50, Dr. Remillard's major criticism was that Plaintiff did not sufficiently document the specific circumstances that led him to make the surgical decision to remove the ovary. *See id.* at 50-51; 54-55. In response to Plaintiff's question of what he should have done that he did not do, Dr. Donnell, the hearing officer, told Plaintiff "the only thing that probably would have helped . . . would have been better documentation of your exam when you got in there at the ovary, referencing twisting." *Id.* at 57. Dr Remillard then stated,

> I . . . can't criticize the surgical management. I probably would have done the same thing. It would have been nice to write an extra two or three lines . . . [saying] this is what I'm seeing, that is what I'm finding, this is what I'm thinking, and this is what I acted upon. And it wasn't very clear in there.

*Id.* at 57-58. One of the other panel members then commented that, if it was a documentation issue, and Dr. Remillard would have done the same thing, it really wasn't a standard-of-care issue. *Id.* at 58.

2. Case 4 - #219986 - category 5 (reduced to a 4 at the hearing because nothing negative happened to the patient). The PRC's only criticism was Plaintiff's failure to document the fetal "dating criteria" or gestational weight in the hospital charts and failure to document why he decided to deliver a 34 week + 4 day fetus (with a fundal height of 35 weeks) at Gila Regional instead of arranging to transfer the mother to Albuquerque, *see id.* at 61-80; *see* Doc. 44, Ex. K4 at 2 (rating all areas "satisfactory" except "was there documentation in the medical record evidencing clinical

decision making as timely and appropriate?").  Plaintiff explained that, according to the lab reports

he ordered that were in the record, there were no infection or other issues with the fetus other than

that it was premature; that when he first started working at Gila Regional, they told him that they

were confident in caring for infants that were gestationally older than 34 weeks in their level-one

nursery; that the mother had reported, and he confirmed through tests, that she was leaking amniotic

fluid for 1-2 days; and that the mother's drug screen was negative even though she had taken drugs

early in the pregnancy.  See Doc. 44, Ex. R at 65.  Dr. Remillard noted that he had called "the

perinatologist regarding this case, and they felt that inducing [this] patient . . . would be appropriate

in this scenario."  *Id.* at 77.

     3.  Case 9 - #76636 - category 5 (but surgery was cancelled, so no harm to patient)- case

discussed, *supra*.  The only criticism seemed to be that the patient was a high anesthesia risk and

that Plaintiff failed to document in the hospital charts the connection between the CT scan showing

a mass and the pain in his decision to perform a diagnostic laparoscopy.  *See* Doc. 44, Ex. R at 80-

93.  The Plaintiff pointed out that a cardiac specialist determined on December 10, 2008 that the

patient was a "low and reasonable risk" for surgery.  *See* Doc. 44, Ex. K10 at 13 (cardiologist's

report).  Further, although the PRC reviewer had stated: "No pelvic - not really GYN case," the

medical records shows that the patient subsequently saw Dr. Nwachuku, who (with Dr. Wendler)

performed an open laparotomy and adnexectomy to remove an ovarian mass under anesthesia a

month later, with no complications.  *See* Doc. 44, Ex. K10 at 7; Doc. 44, Ex. R at 86.

     4.  Case 10 - #41872 - category 4, discussed, *supra*, "medical management question." Doc.

44, Ex. R at 93.   As noted, *supra,* the major complaint was the alleged untimeliness of calling in

a surgical consult.  *See id.* at 104.  At the fair hearing, Plaintiff explained that surgeons at UNM did

an open surgery and found that her small bowel had been perforated.  *See id.* at 100.  After

reviewing the hospital charts, one of the panelists/surgeons expressed "the likelihood" that the perforation happened during Plaintiff's and Dr. Nwachuku's original laparotomy because of her symptoms when she was admitted on September 2 and because discovery of perforations are often delayed until they "actually necrose to the wall." *Id.* at 112. In his opinion, based upon her symptoms, the "idea to [do the exploratory laparoscopy] was right. The idea to operate for adhesions was wrong" because Plaintiff should have been looking for perforations at that point in time. *Id.* at 113. Another doctor suggested that, if "omentum is wrapped around a little, small perforation," when adhesions are released, "you stir all that up and it spreads out," making it worse. *Id.* at 112. But because Plaintiff had requested a surgical consult, and his plan was to do a diagnostic laparoscopy and possible laparotomy, and because the surgical consult never suggested looking for perforations, the FHC panel stated that, "from the medical records, it reads okay." *Id.* at 115.

5. Case 5 - #196208 - category 4, discussed *supra*. The panel had no further discussion about this case except to finish getting the facts. *See id.* at 116-124. Plaintiff admitted that it was possible that he could have caused the perforations in this very difficult case when he performed the laparoscopy. *See id.* at 122.[13]

6. Case 6 - #86820 - category 4 - another "medical management" question. *Id.* at 124. Dr. Remillard stated that the PRC's concerns were that "the patient did not improve and it was sort of slow to start bringing in consultants to help manage this patient." *Id.* at 130. But the PRC review form erroneously stated, "bowel injury" and "NO [blood] cultures," *see* Doc. 44, Ex. K6 at 1, which the Plaintiff showed were not true, based on the medical records. *See* Doc. 44, Ex. K6 at 6-8. The

---

[13] The outside expert who reviewed the cases in February 2009, after the Plaintiff's privileges had been permanently suspended, stated, "complications can happen with surgery, so I can't criticize MD unless he has a trend of similar complications. Dr. Nwachuku, I believe, should have called surgery sooner." Doc. 44, Ex. M7 at 1.

Plaintiff explained that, for several days after he and Dr. Nwachuku had removed a post-operative abscess on September 24, the patient's only problem was that she could not void; and that he had initially consulted Dr. Nwachuku, who told him that the problem could be a result of medication, and "that what he normally does is just keep them on the foley for a couple of weeks or transfer them out." *Id.* at 17; Doc. 44, Ex. R at 126-27.  The hospital records showed that the patient was afebrile and stable until October 28, when she developed a "low grade fever," at which point Plaintiff immediately consulted "Dr. Snure."  Doc. 44, Ex. M6 at 2.  When she continued having a low-grade fever on October 29, Plaintiff consulted an infectious diseases specialist, who confirmed on October 30 that he was using an appropriate antibiotic.  *See id.*  When the patient expressed unhappiness with not being able to void and stated that she did not want Plaintiff to take care of her any longer, she was transferred to a hospital in Arizona.  *See* Doc. 44, Ex. R at 125, 127, 131, 135-36.  The patient began voiding within three days of transfer and was doing well.  *See id.* at 127. After examining the charts, Dr. Remillard confirmed that the patient "did improve" after surgery on the 24th, contrary to the MEC's statement that she did not improve, and also confirmed that there were no other infection issues.  *Id.* at 134-35.

7.  Case 7 - #196208 - category 4.  This case involved the same patient as case 5, *supra*, but the PRC's concern was "post-op pain management."  *Id.* at 141.  Plaintiff had prescribed, and the patient had received 50 mg of demerol after she returned to her room after surgery, causing a low respiration rate and oxygen saturation.   The PRC reviewer stated "pain med order excessive, better to repeat lower doses more often; slow to give Narcan."  Doc. 44, Ex. K5 at 2.  In his response, Plaintiff noted that 50-150 mg of demerol is the recommended dosage for adults; that the hospital's anesthetist erroneously gave the patient Nubain when she started crashing after the demerol had been administered; and that Plaintiff "immediately asked the anesthetist to administer Narcan" after the

nurses called him.  *See id.* at 3.  He also showed that he withdrew his order for demerol or any other narcotic drug after the incident and ordered toradol for pain instead.  *See id.; see* Doc. 44, Ex. K5 at 5.  At the fair hearing, Dr. Donnell, the hearing officer and head of anesthesia at Gila Regional, confirmed that the anesthetist had initially erroneously administered the Nubain, and stated that "to a healthy person who hadn't received anything else, that [dosage of demerol] would have been fine," but noted that "the problem . . . was that it occurred so quickly after surgery. . . that the patient was probably still under the influence of medications from surgery and it was just too much at that time." Doc. 44, Ex. R at 141-42.  The panel discussed that there was "no bad outcome" because medication to counteract the narcotic had been timely given and the patient recovered quickly.  *Id.* at 143, 141.

8.  Case 13 - #51082 - category 4.  According to Dr. Remillard, the PRC stated that Plaintiff's "H&P was felt to be inadequate" because Plaintiff deferred a pelvic exam prior to performing a D&C for a "missed abortion."  *Id.* at 144-45.  The PRC form also questioned whether there was documentation in the record showing that Plaintiff had ordered "clinically pertinent diagnostic tests." Doc. 44, Ex. K7 at 2. At the hearing, it was determined that the patient came in for the D&C after having had a pelvic exam by a midwife who had noted a "fetal demise"; and that she also already had an ultrasound affirmatively showing the demise, *see id.* at 7 (copy of ultrasound); and that she was actively bleeding and had passed blood clots in the ER while waiting for Plaintiff.  *See* Doc. 44, Ex. R at 145-48. Plaintiff explained that he deferred another pelvic exam because she was in pain and he knew that she had to have an immediate D&C based on the referral, the ultrasound, and the blood clots.  *See id.* at 149.  The FHC panel concurred that there was no problem with deferring the exam.  *See id.*

9.  Case 11 - #205132 - category 4.  According to the PRC form, the "H&P pre-op [was] inadequate.  Operative management was questioned due to 1500 ccs of irrigation, and there was

some question about the use of mag citrate after" Plaintiff had performed a laparoscopic lysis of adhesions in a patient who had come in with severe abdominal pain. *Id.* at 150; *see* Doc. 44, Ex. K8 at 1. At the hearing, Plaintiff explained that, during the laparoscopy, he had used a medication created to reduce adhesions to irrigate the abdominal area according to the manufacturer's directions, and that there had been a transcription error in describing the medication. *See* Doc. 44, Ex. R. at 151-52. He explained that the patient had been sent home on non-narcotic pain killers; that she came back to the hospital complaining of constipation four days later; that after other medications for constipation did not work, he prescribed the magnesium citrate, which relieved the constipation and she went home. *See id.* at 153. He skipped a pre-op pelvic exam because "she was having too much pain" but stated that he did a pelvic exam when he inserted "the uterine manipulator" during the surgical proceeding. *See id.* at 153-54. He also mentioned in his written explanation that he had performed a pelvic exam at his clinic before he scheduled the surgery. *See* Doc. 44, Ex. K8 at 3.

The MEC did not call any expert witnesses or other gynecologists to testify about substandard surgical, gynecological, or obstetrical practices, nor did it present any reports or other information, other than the single incident in which the Plaintiff had accidently perforated the bowl of patient #196208 Case 5, showing that Plaintiff definitively had failed to follow a standard of care. No testimony or other evidence disputed the Plaintiff's explanations and testimony at the fair hearing. By failing to bring to Plaintiff's disciplinary hearing the PRC physician-reviewers who expressed their opinions that Plaintiff's performance fell below the standard of care, and by failing to bring in the other physicians who allegedly informed the MEC and PRC members that Plaintiff had committed errors falling by failing to consult, Gila Regional and its MEC deprived Plaintiff of an opportunity to cross-examine the witnesses against him. As a matter of law, this failure violated

Plaintiff's rights of cross-examination under both the Bylaws and  the minimum standards of

constitutional due process.

> Certain principles have remained relatively immutable in our jurisprudence. One of
> these is that where governmental action seriously injures an individual, and the
> reasonableness of the action depends on fact findings, the evidence used to prove the
> Government's case must be disclosed to the individual so that he has an opportunity
> to show that it is untrue. While this is important in the case of documentary evidence,
> it is even more important where the evidence consists of the testimony of individuals
> whose memory might be faulty or who, in fact, might be perjurers or persons
> motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have
> formalized these protections in the requirements of confrontation and
> cross-examination.

*Greene v. McElroy*, 360 U.S. 474, 496 (1959); *Wolff*,  418 U.S. at 567 (noting that "confrontation

and cross-examination of those furnishing evidence against" a defendant "are essential" in trials in

which "a person may lose his job in society") (citing *Greene v. McElroy*, 360 U.S. 474, 496-497

(1959)).

Because one of the panel members had to leave, the panel decided that there was no need to

review or discuss the three category-3 cases submitted by the PRC, and Dr. Donnell informed

Plaintiff that they were going to conclude the hearing and "reconvene on Thursday just as a panel

to discuss *what was discussed here today*" and reach their decision. *Id.* at 155 (italics added).  Thus,

the FHC reviewed a total of 9 cases, discussed *supra*, only one of which indicated that Plaintiff had

perforated a bowel during laparoscopic lysis of adhesions (and, as the outside peer reviewer later

noted, unless Plaintiff had a pattern of perforating bowels during those procedures, that may have

been a one-time simple mistake).  As noted by the summary of the cases set out above, no surgical/

gynecological expert indicated that Plaintiff had fallen below the standard of care on any other kind

of surgical or obstetrical proceeding or otherwise placed patients in danger.  As noted, the PRC

reviewers' most common complaint was Plaintiff's failure to fully document what he had done.

But before the FHC reached a decision regarding a recommendation to the MEC and Board of Trustees, on December 17, 2008, Dr. Remillard wrote to the New Mexico Board of Medical Examiners to inform them of the two suspensions of Plaintiff's privileges.  Doc. 44, Ex. Q.

The FHC panel reconvened on December 18 and made the following non-specific findings, none of which specifically concluded that Plaintiff had fallen below a standard of care:

> (1) There was evidence of poor surgical judgment in several cases involving the laparoscopic lysis of adhesions;
> (2) There was evidence of poor obstetrical judgment in one case; and
> (3) There was evidence of poor documentation of preoperative evaluations and of intraoperative surgical findings in several cases.

Doc. 44, Ex. W at 1.  Based on "the case reviews and these findings" the FHC panel made the following recommendations to the MEC and Board of Trustees.

> (1) Restore [Plaintiff's] Gynecology privileges except for the laparoscopic lysis of adhesions.
> (2) Institute ongoing focused chart review for [Plaintiff's] obstetric and gynecologic cases.
> (3) Mandate additional education for [Plaintiff] with regard to the indications for and techniques of laparoscopic lysis of adhesion.
> (4) Require additional education for [Plaintiff] focused on risk management and medical records documentation.

*Id.* at 2.  Because it is clear, on undisputed evidence, that the December 15, 2008 hearing was not fair both because there was not an impartial hearing panel and because Plaintiff was not given a fair opportunity to confront and cross-examine the other physicians who had prepared the PRC forms and expressed "expert testimony" that was used against him, I conclude, as a matter of law, that the FHC's recommended disciplinary and sanction actions were not made "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3).

29

**D. Proceedings before the Board of Trustees.**

The MEC held a special meeting on December 29, 2008 to discuss the FHC's recommendations. Despite the fact that Dr. Remillard, the only gynecologist on the FHC panel and Gila Regional's CMO, concurred in the FHC recommendations and signed off on them, the MEC sent a much harsher, more extensive set of recommendations to the Board that also affected Plaintiff's ability to practice obstetrics at Gila Regional. *See* Doc. 44, Ex. N at 1, 6. These recommendations included:

> 1. Suspension of all gynecologic surgical privileges
> 2. Obtain consultations for all obstetrical patients with medical or surgical complications and consultations for all Special Care Unit admissions.
> 3. Send charts in question for outside review.
> 4. Ongoing focused review of all obstetric patients.
> 5. Six hours of Continuing Medical Education of Risk Management, including education on medical record documentation.
> 6. Before GYN privileges reinstated, additional education with regard to the indications for and techniques for all gynecological surgery and receipt of information from an educator that Dr. Oswaguwu is competent to practice in a small town.

*Id.* at 1. The MEC gave no reasons for ignoring the recommendations of its PRC and its FHC, both of which had conducted a much more thorough review of the hospital records than had the MEC members, nor did it give any reasons for recommending imposition of these extremely harsh sanctions, many of which appear to have no basis in the evidence. As a matter of law, I conclude that the MEC did not make these recommendations or continue its sanctions "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement" of providing the Plaintiff with a fair hearing. 42 U.S.C. § 11112(a)(3), (4).

The Board of Trustees held its hearing on February 2, 2009. The questions the Board of Trustees posed were whether the Plaintiff had been given "notice and a hearing" and whether the

MEC's recommendations are "reasonable and supported by substantial evidence." Doc. 44, Ex. N at 1. The Board's summary index of the proceedings contained untrue statements. For example, it stated that the Plaintiff had "provided input on selection of the [peer] Committee members," *see id.* at 2, even though the Plaintiff had no idea that a PRC had been convened to evaluate all of his hospital records before issuance of the second sanction on November 24, 2008, and it stated that category 3 cases were reviewed "in detail" at the fair hearing, *see id.* at 5 even though the FHC had decided <u>not</u> to consider those cases and did not review them at the December 15, 2008 hearing. In addition, the Board of Trustees considered case-note summaries of cases 1 and 2, which were category 3 cases that the FHC decided to disregard and about which Plaintiff had no opportunity to comment or defend at the fair hearing. *See id.* at 4.

It is unclear who made the summary of the case notes for the Board of Trustees in advance of the public hearing, but it appears that they came from the PRC's Medical Staff Q A & I sheets and the MEC's November 24 meeting because they included several cases that were never discussed at the fair hearing and several incorrect statements of fact that had been corrected at the fair hearing. *See id.* at 3.

For example, the summary of Case 4 stated as a criticism: "induction of labor in high-risk OB patient at [] 35 weeks gestation, pregnancy complicated by alcohol and methamphetamine use," *see id.* at 3, despite the facts that: 1) there was absolutely no evidence or testimony that the mother was high risk or had complications during her pregnancy; 2) Plaintiff testified that he had been the mother's OB physician since the first trimester; that she had been drug-free since her first trimester; and that her lab results continued to show no drug or alcohol in her system at the time he decided to induce, *see* Doc. 44, Ex. R at 64-65, 77; and 3) Dr. Remillard had established at the fair hearing that inducing labor in that patient was the correct thing to do under the circumstances, *id.* at 77.

And the summary of Case 6 states the criticism of Plaintiff's treatment as, "Pelvic abscess: 5 days before infectious disease consult; 6 days before surgery consult."  Doc. 44, Ex. N at 3.  But undisputed testimony and evidence at the fair hearing had established that, after the pelvic abscess was removed, there were no further infection or surgical issues; that the patient's only problem after the abscess removal was that she could not urinate without a foley catheter; and that she was transferred at her request because she could not urinate.  *See* Doc. 44, Ex. R at 134-37.  The case-note summary also incorrectly stated that "no blood culture or urinalysis ordered," Doc. 44, Ex. N at 4, but as noted, *supra*, Plaintiff conclusively established at the fair hearing that he had obtained both blood cultures and urinalyses and the FHC panel extensively examined them.

At the February 4, 2009 hearing, contrary to Gila Regional's bylaws, the Board heard new evidence from Dr. Montoya, the only physician/member of the Board of Trustees, regarding two cases in which Dr. Montoya believed that Plaintiff's medical "performance was unsatisfactory," and Plaintiff was not permitted to challenge his testimony through cross-examination.  Am. Compl. at ¶¶ 83-84.  On February 4, 2009, the Board, without Dr. Montoya voting, decided to take the MEC's, instead of the FHC's recommendations and permanently suspended all of Plaintiff's gynecological privileges and imposed the other sanctions and requirements recommended by the MEC.  *See* Doc. 57 at 4, ¶ 8 (accepting, as undisputed, these fact taken from "Pl.'s Memorandum of Fact and Law in Support of Pl.'s Mot. for Leave to Amend and Supplement Complaint, Part 2(X)").

Based on these undisputed facts, I conclude as a matter of law that Gila Regional, through its Board did not meet its statutory duty to impose permanent sanctions only "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and [] in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the

32

requirement of paragraph (3)."  42 U.S.C. § 11112(a)(3), (4).

**E. Post-hearing events.**

On March 4, 2009, Dr. Remillard submitted a report to the National Practitioner Data Bank, informing it of the Board's February 2, 2009 final "indefinite" suspension and reduction of clinical privileges.  Doc. 44, Ex. G (44-1 at 2-5).  But there are errors in Dr. Remillard's report, the most negative being that he erroneously stated that the results of "an outside peer review of selected cases" contributed to the Board's decision to taking its final adverse actions.  *Id.* at 2.  As the basis for the Board's action, Dr. Remillard also cited "substandard or inadequate skill level," "immediate threat to health or safety," and "substandard or inadequate care," *id.* at 3, when there has never been a final finding made by an expert, the Board, the MEC, or the FHC that, in fact, Plaintiff fell below the standard of care or that he is so incompetent that he poses an "immediate threat to health or safety."  And Dr. Remillard did not check the box indicating that Plaintiff disputed the report.  *See id.*  Plaintiff has presented compelling evidence, therefore, "for a jury to conclude [Dr. Remillard's] report was false and the reporting party knew it was false."  *Brown*, 101 F.3d at 1334.

Based on Dr. Remillard's report of Gila Regional's adverse actions and submission of some of the Gila hospital records regarding some of the same cases before the FHC, on January 18, 2011, the New Mexico Medical Board ("NMMB") sent Plaintiff a notice that it intended to impose sanctions that could include restricting, revoking, or suspending his medical license if Plaintiff did not adequately rebut or explain that evidence.  *See* Doc. 44, Ex. U at 1.  After a hearing, at which the state's expert in surgical gynecology and obstetrics testified, the NMMB noted that the expert concluded that the expert's clinical judgment differed in some cases from Plaintiff's, and that the expert would have documented the medical information more adequately or differently, but that the expert did not believe that the Plaintiff's judgment was "careless," "bad," or "unreasonable."  *See*

Doc. 44, Ex. S at 2.  Accordingly, the Board found that the care given and the medical record-keeping in these cases "represented matters of clinical judgment" and concluded that the charges that Plaintiff had "deviated from the standard of care with  a resulting possible or probable change of outcome" were not "substantiated by a preponderance" of the evidence.  *Id.* at 1, 9.

## III.    CONCLUSION

Although I conclude that it was not necessary for the MEC to give Dr. Osuagwu pre-deprivation notice and a hearing before it temporarily suspended his privileges and imposed other restrictions pending further investigation, *see Guttman v. Khalsa*, ___ F.3d __, __, 2012 WL 76055, *8-*9, I also find that Plaintiff has presented undisputed and compelling evidence showing, as a matter of law, that the MEC and the PRC did not make "a reasonable effort to obtain the facts" of the specific cases during his temporary suspensions.  *See* 42 U.S.C. § 11112(a)(2).  As noted, *supra*, the MEC and PRC did not give Dr. Oswagwu post-suspension specific notice of the cases they were investigating that caused them to initially believe that he may be putting patients in imminent danger within 5 days of the suspensions, as required by the bylaws, nor did it give him an opportunity to defend his actions or to learn exactly what he was being accused of so that he could try to put to rest these concerns before the MEC imposed its second, indefinite suspension without notice or a hearing.

I also find and conclude that the MEC did not impose its December 30, 2008 suspensions and disciplinary actions, or make these recommendations as permanent sanctions to the Board "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement" of providing the Plaintiff with a fair hearing.  42 U.S.C. § 11112(a)(3), (4).  As noted above, the MEC gave no reasons for ignoring the recommendations of its PRC and its FHC, both of which had conducted a more thorough review of

the hospital records than had the MEC members, nor did it give any reasons for recommending imposition of its extremely harsh sanctions.

I also conclude that the MEC, FHC, and Board of Trustees all failed to take action only "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." Id. § 11112(a)(3), (4).  As noted, the December 15, 2008 hearing was not procedurally fair in that Plaintiff was not given a fair opportunity to confront and cross-examine the anonymous physicians who prepared the peer-review forms accusing Plaintiff of violating the standards of care upon which the FHC relied at least in part, and because the FHC panel was not impartial because Gila Regional's CMO – who holds a position of power over all of the physicians who participated in the disciplinary proceedings – served as Plaintiff's accuser, investigator, prosecutor, and one of his judges.  The Board's February 2, 2009 hearing was not fair because the Board considered evidence not presented at the December 15, 2008 hearing and heard new testimony that Plaintiff was not permitted to defend against.  Gila Regional's bylaws provided fair procedures for determining the reasonableness and propriety of imposing severe sanctions that will negatively affect Plaintiff for the rest of his professional career, but the record demonstrates that Gila Regional, through its MRC, PRC, FHC, and Board did not follow those procedures.

Because the undisputed evidence in the record conclusively demonstrates that the peer-review action did not meet the standards specified by Congress in 42 U.S.C. § 11112(a)(2), (3), and (4), I conclude that Gila Regional and the individual members of its MEC, PRC, FHC, and Board who have now been added as Defendants are not "immune from [Plaintiff's] private damage claims stemming from the peer review action." Brown, 101 F.3d at 1333.  Similarly, I conclude that the undisputed evidence conclusively demonstrates that these Defendants did not "act in the reasonable

belief that [their] actions or recommendations [were] warranted by the facts known to [them] after reasonable efforts to ascertain the facts is made."  NMSA 1978 §§ 41-9-2, -4; *Leyba v. Renger*, 114 N.M. 686, 689, 845 P.2d 780, 783 (1992) ("The NMROIA reflects a reasoned balance between the competing needs of the public for frank and accurate review of a physician's qualifications and the needs of physicians being credentialed for a fair and impartial review process.").

**IT IS ORDERED** that the Defendant's motion for summary judgment [Doc. 57] is DENIED.

**DATED** this 27th day of March 2012.

_____
**MARTHA VAZQUEZ**
**UNITED STATES DISTRICT JUDGE**

*Attorneys for parties*:

Dr. Chinonyerem Osuagwu, *pro se*
6240 Indian School Rd. NE, # B325
Albuquerque, NM 87110

*Attorneys for Defendant Gila Regional*:

Candace J Cavanaugh
Butt Thornton & Baehr PC
4101 Indian School Rd. NE, # 300S
Albuquerque, NM 87110