## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CHINONYEREM OSUAGWU,

     **Plaintiff,**

vs.                                         **No. 11cv001 MV/SMV**

GILA REGIONAL MEDICAL
CENTER; JEAN REMILLARD, M.D.;
GREGORY KOURY, M.D.;
MICHAEL SERGEANT, M.D.;
MARK DONNELL, M.D.;
RONALD DEYHLE, M.D.;
DON WHITE,

     **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *pro-se* Plaintiff/Physician Chinonyerem Osuagwu's *Motion for Summary Judgment*, filed August 23, 2012 [Doc. 135] and on Defendants' cross-motion for summary judgment, filed in response [Doc. 160]. Plaintiff contends that the undisputed record, as set forth in part in my March 27, 2012 Memorandum Opinion and Order ("MOO") denying summary judgment to Gila Regional Medical Center, demonstrates that he is entitled to summary judgment on his § 1983 claims. Defendants assert qualified immunity on the contention that it is not clearly established Supreme Court or Tenth Circuit law that Plaintiff had a constitutionally-protected property interest in his medical privileges granted by Gila Regional Hospital, and they alternatively contend that they did not violate Plaintiff's right to due process. Having considered the parties' submissions, the record, and the applicable law, I have decided to temporarily bifurcate Plaintiff's § 1983 claims against Gila Regional from his § 1983 claims against the individual Defendants and his state-law claims, and will address in this memorandum opinion and order only Plaintiff's § 1983 claims against Gila Regional Medical Center. I will grant Plaintiff's motion for

summary judgment on his § 1983 claims **as to Gila Regional Medical Center** and his request for injunctive relief, and will enter an order requiring Gila Regional to reinstate Plaintiff's medical privileges and to withdraw the reports that it sent to the New Mexico Medical Board and the National Practitioner Data Bank so that Plaintiff's record may be cleared and he may apply for privileges at other hospitals and mitigate his damages.  I will resolve the remaining pending matters and motions at a later date, and a jury may decide the issue of monetary damages on the § 1983 claims against Gila Regional.  I will adopt and incorporate into this MOO some of the findings and conclusions set forth in my March 27, 2012 MOO for the purpose of analyzing the due-process issues in this case, and, therefore, I quote liberally from that opinion.

## BACKGROUND

Plaintiff:

> sued Gila Regional and several individuals under 42 U.S.C. § 1983 for damages and injunctive relief, alleging violation of his due-process rights, defamation, and intentional infliction of emotional distress.  He alleges that Gila Regional, through the actions and conduct of Don White (the Chairman of its Board of Trustees); Dr. Jean Remillard (its Chief Medical Officer); the individual members of its internal Peer Review Committee ("PRC"); the members of its Medical Executive Committee ("MEC"); the members of its Fair Hearing Committee ("FHC" or "panel"); and Ronald Dehyle, an Outside Peer Reviewer, violated his civil rights when, without a reasonable belief that their actions were warranted by known facts, without a reasonable effort to obtain facts, and without following the process due to Plaintiff, the MEC and Board of Trustees temporarily and then indefinitely suspended his medical privileges and imposed harsh requirements for regaining those privileges, and Dr. Remillard filed notice of that adverse action with the National Practitioner Databank and the New Mexico Medical Board.  Plaintiff also contends that the Defendants have tortiously damaged his reputation and intentionally inflicted emotional distress.

*Osuagwu v. Gila Reg'l Med. Ctr.*, 850 F. Supp. 2d 1216, 1219 (D.N.M. March 27, 2012) (footnote omitted.).  The parties have engaged in discovery, which ended on November 19, 2012.

## APPLICABLE STANDARDS

> Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."[1] FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (noting that a summary-judgment movant need not negate all the nonmovant's claims, but need only point to an "absence of evidence to support the nonmoving party's case"). The party seeking summary judgment has the initial burden to show that there is an absence of evidence to support the nonmoving party's case. Once [the movant] meets this burden, the burden shifts to [the non-moving party] to identify specific facts that show the existence of a genuine issue of material fact. The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment in favor of the moving party is proper.

*Thomas v. Int'l Bus. Machs*., 48 F.3d 478, 484 (10th Cir. 1995) (internal quotation marks and citations omitted). The ultimate inquiry in a summary-judgment disposition is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When applying th[e summary-judgment] standard, [the court] view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (internal quotation marks omitted).

> "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir.1979). Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000).

---

[1] "Rule 56 was amended, effective December 1, 2010. Under the amended rule, the standard previously enumerated in subsection (c) was moved to subsection (a), and the term genuine 'issue' became genuine 'dispute.' *See* Fed. R. Civ. P. 56 advisory committee's notes (2010 Amendments). However, the 'standard for granting summary judgment remains unchanged.' *Id.*" *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 n.8 (10th Cir. 2011).

> Where the facts are not in dispute and the parties only disagree about whether the actions were constitutional, summary disposition is appropriate. *See* Fed. R. Civ. P. 56(c).

*Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

"The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011) (internal quotation marks omitted).  The Court may, of course, revisit rulings made before a final judgment is entered.  *See id.*

A governmental entity, like the public hospital in this case, "can be sued for monetary, declaratory, or injunctive relief for depriving someone of constitutional or civil rights.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Qualified immunity is not available as a defense to [such] liability."  *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000).

> Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).  Thus, constitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials.

*Hulen v. Yates*, 322 F.3d 1229, 1240 (10th Cir. 2003).  "A successful procedural due process claim requires a plaintiff to show (1) the deprivation of a liberty or property interest and (2) the absence of due process. *Stears v. Sheridan County Mem'l Hosp. Bd. of Trs.*, 491 F.3d 1160, 1162 (10th Cir. 2007)."  *Mecca v. United States*, No. 09-1569, 389 F App'x 775, 781, 2010 WL 2893617, **4 (10th Cir. July 26, 2010).

> To show a deprivation of one's liberty interest in professional reputation, a plaintiff must demonstrate (1) "statements [that] impugn the good name, reputation, honor, or integrity of the employee"; (2) "the statements [were] false"; (3) the "statements ... occur[red] in the course of terminating the employee or must foreclose other employment opportunities"; and (4) "the statements [were] published."  *Watson v.*

*Univ. of Utah Med. Ctr.*, 75 F.3d 569, 579 (10th Cir. 1996) (quotation omitted).

*Id.* at 782, 2010 WL 2893617, **5.

> When a public employer takes action to terminate an employee based
> upon a public statement of unfounded charges of dishonesty or
> immorality that might seriously damage the employee's standing or
> associations in the community and foreclose the employee's freedom
> to take advantage of future employment opportunities, a claim for
> relief is created.
>
> *Melton v. City of Okla. City*, 928 F.2d 920, 927 (10th Cir.), *cert. denied*, 502 U.S.
> 906 (1991).  A plaintiff must show that his dismissal resulted in "the publication of
> information which was false and stigmatizing-information which had the general
> effect of curtailing her future freedom of choice or action."  *Asbill v. Housing Auth.
> of the Choctaw Nation*, 726 F.2d 1499, 1503 (10th Cir.1984) (footnotes omitted).
> The public statements "'must rise to such a serious level as to place the employee's
> good name, reputation, honor, or integrity at stake.'"  *Six v. Henry*, 42 F.3d 582, 585
> (10th Cir. 1994) (*quoting Asbill*, 726 F.2d at 1503).

*Custodio v. Parker*,  No. 94-1587, 65 F.3d 178, 1995 WL 523123, *4 (10th Cir. Sept. 6, 1995)

(unpublished).

"While it is true that procedural protections alone do not create a property interest," when

the governmental entity publishes rules, like an employee or faculty manual or bylaws that "go

beyond mere procedural protections . . . by requiring either mutual consent or due process," they

place a substantive limitation on the discretion of the entity to terminate or discipline or adversely

change the employment conditions.  *Hulen*, 322 F.3d at 1241.  In that case, a property interest exists

"based upon the terms and conditions" of the appointment and the handbook, manual, or bylaws.

*See id.* at 1243.

Whether the interest protected is a liberty or property interest, resolution of the issue whether

the administrative procedures provided are "constitutionally sufficient requires analysis of the

governmental and private interests that are affected. . . . [I]dentification of the specific dictates of

due process generally requires consideration of three distinct factors:  First, the private interest that

5

will be affected by the official action; second, the risk of an erroneous deprivation of such interest

through the procedures used, and the probable value, if any, of additional or substitute procedural

safeguards; and finally, the Government's interest, including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement would entail."

*Matthews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

> It is an "essential principle of due process . . . that a deprivation of . . . property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case,'" [*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)] *(quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 656, 94 L. Ed. 865 (1950)). The hearing "need not be elaborate;" indeed, " 'something less' than a full evidentiary hearing is sufficient." *Id.* at 545, 105 S. Ct. at 1495. The key requirement is that the employee is entitled to a pre-termination opportunity to respond; more specifically, "to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546, 105 S. Ct. at 1495. Because it is followed by post-termination proceedings, the pre-termination hearing is not meant to resolve definitively the propriety of the discharge, but only to determine whether there are reasonable grounds to believe the charges are true and the action is correct. *Id.* at 546-47, 105 S. Ct. at 1495-96.

*Benavidez v. City of Albuquerque*, 101 F.3d 620, 627 (10th Cir. 1996).

## DISCUSSION

## I.      The Undisputed Facts

The parties have submitted additional documentation into the record. None of the

documentation, with a few exceptions discussed below, calls into question the undisputed facts,

findings, and conclusions set forth in the March 27, 2012 MOO. Thus, I adopt and incorporate those

facts and findings.

Plaintiff had a written contract to provide OB/GYN medical services to Gila Regional for

two years, beginning February 15, 2008, with a guaranteed income of at least $265,000/year, which

could only be terminated either by mutual consent or "for cause-specified." Doc. 162, Ex. GGG

at 1. As a necessary adjunct of the contract, Gila Regional granted medical privileges to Plaintiff, *see* Doc. 160 at 13, ¶ 3, and both parties agreed to be bound by Gila Regional's Bylaws, which included mandatory procedures for physician discipline or suspension of privileges, *see id.* at 14-15, ¶ 10. Under the Bylaws, if the MEC made a recommendation that could permanently adversely affect a physician's clinical privileges, the Board could not take action on the recommendations "until after the procedural rights provided in Art. VIII have been provided." Doc. 162-1 at 10 ¶¶ 7.1-6, Ex. JJJ. From February 15, 2008 to November 17, 2008, there were no complaints about Plaintiff's performance as an OB/GYN. Doc. 160 at 13, ¶ 4.

I previously noted that, ["i]t appears that the MEC at Gila Regional consisted of Dr. Michael [Sergeant], who was its acting Chief of Staff, Dr. Remillard, who was its Chief Medical Officer, Dr. Carreon, Dr. Koury, and Dr. Montoya, a retired gynecologist who was also a member of the Board of Trustees (and who also attended the peer review meetings)." *Oswagwu v. Gila Reg'l Hosp.*, 850 F. Supp. 2d at 1224. There is still no dispute that Dr. Remillard attended the MEC meetings; that he was a voting member of, and served as an "expert witness" for, the PRC; that he served as the prosecuting individual on behalf of the MEC and as an unsworn witness at the fair hearing; and that he also served as a voting member of the quasi-judicial FHC. Although Defendants now contend that Dr. Remillard was a non-voting "ex-officio" member of the MEC, the Bylaws do not provide for the CMO to attend or be a member of the MEC – ex-officio or otherwise – and the MEC is "subject to the limitations imposed by these Bylaws." *See* Doc. 160, Ex. C at 7, ¶ 12.2-1, ¶ 12.2-2; Doc. 160 at 13 ¶ 6 (listing the members and individuals authorized to attend the MEC meetings, which do not include the CMO). Further, it appears that Dr. Montoya was not an MEC member at all, but he attended the November 24, 2008 MEC meeting, after which Plaintiff's suspension was broadened and extended. *See* Doc. 160, Ex. G at 1. Defendants have now presented evidence that

Dr. Montoya, who was the only physician/member on Gila Regional's Board of Trustees at the February 4, 2009 final hearing, voted **not** to follow the MEC's December 29, 2008 recommendations to further broaden and make permanent Plaintiff's suspensions and impose harsh requirements for readmission. *See* Doc. 160, Ex. D at 1, 3.

Defendants have presented documentation showing that there were ten "active" physician-members of the MEC on November 17, 2008 (the first "emergency" MEC meeting, at which Plaintiff's abilities were questioned), including Dr. Nwachuku (the only other practicing OB/GYN in town and the physician with whom Plaintiff practiced); Dr. Carreon (orthopedic surgeon), Dr. Koury (family practitioner), Dr. Snure (general surgeon), Dr. Mittica (opthamologist), Dr. Arizaga-Morales (psychiatrist), Dr. Wilcox (emergency medicine), Dr. Stinar (pulmonologist), and Dr. Sergeant (family practitioner). In addition, Dr. Sparks (an otolaryngologist), who was the Chief of Staff at that time, *see* Doc. 57, Exs. 1, 2, was an "active member," but she was entitled to vote only in case of a tie between the active members. *See* Doc. 160, Ex. F at 1, Ex. C at 7. Thus, according to Defendants' documentation, only 4 of the 9 active members entitled to vote were present at this first meeting: Drs. Nwachuku, Carreon, Sergeant, and Snure.

As noted in the March 27, 2012 MOO:

> based on "complications from two diagnostic laparoscopic procedures," the MEC summarily but temporarily suspended Plaintiff's privileges to perform elective laparoscopic procedures for 14 days, and required Dr. Nwachuku to assist Plaintiff on emergency laparoscopies during that 14–day period. In violation of Gila Regional's Bylaws, *supra*, the notice of suspension did not specify which laparoscopic procedures were in question, nor did the MEC ever interview the Plaintiff regarding the charges against him or the two cases it was considering. *See id.*; Doc. 44, Ex. R at 31–32.

> At the fair hearing, Dr. Carreon, whom the MEC appointed to present its case, explained that the MEC believed that, although the two surgical cases had been "difficult" and "high-risk" ones, "having two complications [from bowel perforations] in the [5 to 6–week period of time] was a little bit over the acceptable

8

limit," and it wanted a Peer Review Committee ("PRC") to further investigate Plaintiff's performance. Doc. 44, Ex. R at 9–12. Although not mentioned in its November 17, 2008 notice of suspension, Dr. Carreon also cited a recent instance in which Plaintiff attempted to schedule an exploratory laparoscopy of an obese patient, which was cancelled when the nurse anesthetist refused to administer anesthesia. *See id.* at 6–8. It was this third event that actually instigated the MEC's summary-suspension action. *See id.*; *id.* at 11–12.

*Oswagwu*, 850 F. Supp. 2d 1225-26. Defendants have now submitted the minutes of the November 17, 2008 MEC meeting, which document the third event that the MEC found to be disturbing. *See* Doc. 160, Ex. F at 1. It appears that Dr. Nwachuku did not inform the other three voting members of the MEC at that meeting that he – and not Plaintiff – was the lead surgeon in the first instance of perforated bowel. The MEC committee members, three of whom performed surgeries of various sorts, agreed that "the outcomes for [Plaintiff's] open surgical cases was considered not to need review." *Id.* Thus, they voted to summarily suspend only Plaintiff's right to perform elective laparoscopic procedures for 14 days, and required Dr. Nwachuku to assist Plaintiff on emergency laparoscopies during that 14–day period.

Critically, section 7.2-1 of the Bylaws provides that, if the MEC summarily suspended a physician, the suspension would "automatically expire if not at the end of fourteen (14) days extended by action of the MEC pursuant to [subsection 7.2-2]." Doc. 162-1 at 10, ¶ 7.2-1. Subsection 7.2-2 mandated the MEC to "interview the practitioner affected by the summary suspension," within 5 days of that suspension and to inform him of its specific basis, including a written statement and summary "of at least one or more particular incidents giving rise to the assessment of imminent danger" "demonstrating that failure to suspend could have reasonably resulted in an imminent danger to the health of an individual," and giving the practitioner "an opportunity to discuss, explain, or refute the facts that made the basis of the suspension." *Id.* at 10-11, ¶ 7.2.2. As noted previously, the MEC never gave Plaintiff an opportunity to explain or

comment on those two incidents, in violation of the Bylaws.  *See* Doc. 160 at 4, ¶ 4.  In its notice

to Plaintiff, the MEC only referred to two unspecified "diagnostic laparoscopi[c] procedures recently

performed by you," and informed him that "[t]hese incidents will be investigated by the Peer Review

Committee."  Doc. 57, Ex. 1.  The letter informed Plaintiff that "this time frame is not a reportable

event."  *Id.*

The parties have identified Dr. Koury as the MEC member who coordinated the PRC that

was to review Plaintiff's laparoscopic-surgical abilities.  *See* Doc. 135 at 3, ¶ 5; Doc. 160 at 4, ¶ 5.

Defendants have not identified any of the other PRC members except for Dr. Remillard, and in their

answers to interrogatories, they answered "NO" to the question whether *any* member of the PRC

who participated in Plaintiff's review "trained as a [GYN/OB]."  Doc. 51 at 52-53, Ex. EE at 14.

At the follow-up MEC meeting held a week later, on November 24, 2008, 8 active

physician/members were present, including Dr. Nwachuku and the other original members except

for Dr. Sparks.  *See id.*, Ex. G.  By this time, Dr. Sparks was no longer Chief of Staff, and Dr.

Sergeant was the acting Chief of Staff.  Dr. Carreon – instead of Dr. Koury, the PRC coordinator

– reported a summary of what the PRC's alleged findings were, but the parties still have not

submitted the actual findings other than those found in the anonymously-filled-out "Medical Staff

QA & I" forms.  As previously noted,

> according to Dr. Remillard, the only reasons the MEC stated they were initially
> concerned about th[e first bowel-perforation] case were what they perceived as "the
> [un]timeliness of obtaining consultation on this patient" from the general surgeon
> and the fact that she was not transferred to another hospital until September 7.  Doc.
> 44, Ex. R at 104.  In other words, the MEC apparently did not believe that the
> Plaintiff's actions had placed this patient in "imminent danger."

*Osuagwu*, 850 F. Supp.2d at 1226.  Further, "[t]he MEC never concluded that Plaintiff had put th[e

third] patient in 'imminent danger' by attempting to schedule the elective exploratory laparotomy."

*Id.* Contrary to the MEC's authorization to the PRC to review only two laparoscopic cases and the MEC's specific finding that there was no need to review surgical cases (or any other type of case), 34 cases were examined the previous week by the PRC, including OB cases.  Dr. Remillard explained that:

> other, unidentified physicians who performed laparoscopic procedures allegedly told Dr. Remillard or Dr. Carreon that they had never perforated a bowel during a laparoscopic procedure, [so] the PRC decided to look at not only the Plaintiff's surgical skills, but also at his other skills to see if there was "a problem with any other kind of cases."

*Id.* at 1228.

As I previously found, "it is undisputed that, contrary to the Bylaw's requirements and the usual procedure at Gila Regional, neither the MEC nor the PRC interviewed or otherwise questioned Plaintiff about these [or any] cases before or during the initial 7–day suspension or during the subsequent indefinite extension and expansion of Plaintiff's suspension during the three weeks before the fair hearing."  *Id.* at 1226; *see* Doc. 160 at 4, ¶¶ 4, 5.

The November 24, 2008 MEC minutes of a two-hour meeting contain a summary of the PRC findings as set forth by Dr. Carreon.  The PRC's concerns were that the reviewers noted a "high number of complications;" that some reviewers questioned Plaintiff's "judgment" on some unspecified cases; that there "was a pattern of inadequate histories and physicals documented," including apparent lack of pelvic examinations; there were questions about why certain tests were not performed in unspecified cases; that there were "delays in consultations" in unspecified cases; that the "two perforations were concerning;" that an ovary was removed without "documentation of necrosis;" that two "controversial" medial-lateral episiotomies had been performed; that Plaintiff wanted to do laparoscopic surgery on a patient with no uterus, ovaries, or tubes instead of having a general surgeon perform the surgery; and that "Special Care Unit" management was questioned

11

in unspecified cases.  Doc. 160, Ex. G at 2.  Plaintiff, however, has submitted testimonial and documentary evidence, and Defendants do not deny, that the PRC reviewers made many mistakes in conducting their review, including reporting that Plaintiff had not ordered critical diagnostic tests, which had in fact been performed and were in the patients' records, and that they misinterpreted words or notations in the charts.  *See* Doc. 134 at 4, ¶¶ 6-9; Doc. 160 at 4-5, ¶¶ 6-9; Doc. 160 at 7, ¶ 20 (conceding that Dr. Remillard noted at the fair hearing that the PRC reviewers had made mistakes in their reports).  Plaintiff also provided undisputed documentary evidence that, as to the third patient that the MEC believed should not have been scheduled for surgery, Dr. Nwachuku later actually successfully performed the same surgery that Plaintiff had been scheduled to perform, *see* Doc 44, Ex. K10 at 7; Doc. 44, Ex. R at 86.  Accordingly, the reviewer's indication that Plaintiff should not have scheduled the surgery, and that doing so was an extreme departure from the standard of care, was unfounded.  But, of course, Plaintiff was never permitted to point out these errors to the MEC or PRC.  After Dr. Carreon's presentation at the November 24, 2008 MEC meeting, and apparently without even taking a formal vote (in violation of the Bylaws, *see* Doc. 160, Ex. C at 8, ¶ 13.8), and,

> with no finding of "imminent danger," in violation of the Bylaws, the MEC "broadened [the suspension] to all gynecological privileges and also to have mandatory consultation when obstetrical care . . . deviated from normal because of the timeliness of consultation."  Doc. 44, Ex. R at 30; *see* Doc. 57, Ex. 2.  Dr. Carreon stated that the PRC decided to send the charts "to somebody else outside the hospital to have them reviewed and see what their opinion was, as well." Doc. 44, Ex. R at 26; Doc. 57, Ex. 2.  The MEC then informed Plaintiff of its decision to broaden and continue the suspension, but again, the notice did not inform Plaintiff which charts were under scrutiny or what specific actions he had taken or not taken that supplied support for immediate, summary suspension of all of his gynecological privileges, nor did it mention "imminent danger."  Instead, the notice obliquely stated that "there were a high number of cases in which a change of outcome could have been achieved for the patients...." Doc. 57, Ex. 2.  When asked by the FHC panel why Plaintiff was not given the opportunity to provide input during the whole peer-review process, Dr. Remillard attempted to justify the failure to do so by stating

> "we have enough evidence to support those actions, and to make sure that our public is protected, that [Plaintiff] doesn't have privileges to go back to the OR and potentially put other patients in harm's way." Doc. 44, Ex. R at 31–33.

*Osuagwu*, 850 F. Supp.2d at 1229 (footnotes omitted). But it is undisputed that the MEC did not send the charts out to an outside reviewer at that time.

Further, the Bylaws conclusively demonstrate that the November 24, 2008 action represented a second, new summary suspension, given without prior notice or an opportunity to challenge the action, and that, therefore, it was also controlled by subsections 7.2-1 and -2 of the Bylaws. Like the first summary suspension, this suspension "automatically expired" if it was not extended by MEC action that comported with 7.2-2 of the Bylaws, which required the MEC, within 5 days of the suspension, to inform Plaintiff "with a statement of events demonstrating that failure to suspend could have reasonably resulted in imminent danger to the health of an individual, together with a summary of one or more particular incidents giving rise to the assessment of imminent danger," and then to interview Plaintiff and give him "an opportunity to discuss, explain, or refute the facts that made the basis of the suspension." Doc. 162-1 at 10, ¶¶ 7.2-1, 7.2-2. The interview was to be an informal one, but the MEC was to keep a record of the interview. *See id.* ¶ 7.2-2. Then, within 10 days of that interview, the MEC was required to issue "findings" based on the results of the investigation, and **if** it found that failure to maintain the suspension would result in imminent danger, it could modify, continue, or extend the suspension. *Id.* at 11, ¶ 7.2-3. The procedural rights in Art. VII of the Bylaws would be triggered if the suspension were extended. It is undisputed that the MEC never complied with ¶¶ 7.2-2 and 7.2-3. Thus, by operation of the Bylaws, both suspensions automatically expired at the end of 14 days after each suspension. But the MEC acted as though Bylaws 7.2-2 and -3 did not exist, ignored the automatic expiration of the suspensions, and moved forward to the formal hearing process.

13

> As previously noted, when a physician challenges an MEC 's recommendation, [t]he MEC appoints a representative at the fair hearing, who bears the burden to "present appropriate evidence in support of the adverse recommendation." *Id*. at 8, ¶¶ 8.5–8.  The suspended physician has the right to "challenge any witness, [and] to rebut any evidence." *Id.* ¶¶ 8.5–9.

*Osuagwu*, 850 F. Supp. at 1226.  At the fair hearing,

> Dr. Carreon testified that the PRC was concerned that the hospital charts indicated deficiencies in "preoperative evaluation[s]," absences of "documented pelvic exam[s]," lack of documentation regarding what "workup" had been done "prior to taking somebody to surgery;" "whether general surgery should have been involved and wasn't," about "hesitating to obtain consultations in patients that were very ill," about the "timeliness of consultations," and about a "diagnosis prior to an operation and the [subsequent] pathology not being consistent." Doc. 44, Ex. R at 13–14, 16, 20, 23.

*Id.* at 1228.  However,

> [o]ver Plaintiff's objections and request for specific information about each case in which he was accused of not meeting a standard of care, *see, e.g. id.* at 15–16, 21–24, Dr. Carreon stated that he did not have time to go through each case the PRC had reviewed; thus he simply gave a general summary from his "memory" about what he thought the problems actually were.  *See* Doc. 44, Ex. R at 4–6; *id*. at 16.  Dr. Carreon called no witnesses, experts, or other physicians/consults who had worked with Plaintiff on any of the cases.  After giving the general summary, and summarizing case # 9, regarding Plaintiff's attempt to schedule the diagnostic laparoscopy for the obese patient with asthma issues that had led to the initial suspension and investigation, Dr. Carreon apparently left at the first break, instead of presenting all of the evidence on which the MEC had based its two summary-suspension decisions.  *See id.* at 5–28.

*Id.* at 1230.

As noted in my previous MOO, Dr. Remillard then took over the MEC's presentation of evidence, even though he was a voting member of the quasi-judicial FHC.  I painstakingly set forth the undisputed evidence regarding the nine cases that the FHC considered at the hearing (which provided the basis for ten charges of substandard care), and I adopt those facts in this MOO.  *See Osugwu*, 850 F. Supp. 2d at 1226-27, 1231-34.  I have noted some of the many errors the PRC reviewers made.  For example, contrary to a PRC reviewer's opinion (who was not an OB/GYN)

that taking out one patient's ovary was a deviation from the standard of care with probable change

of outcome,  Dr. Remillard, in the capacity as an expert witness, opined at the hearing that, based

on the CT and ultrasound scans, a radiology report, and the enlarged size and torsion of the patient's

ovary, there was a definite risk of **not** removing the ovary.  *See id.*  at 1231.  Otherwise, however,

> [t]he MEC did not call any expert witnesses or other gynecologists to testify about
> substandard surgical, gynecological, or obstetrical practices, nor did it present any
> reports or other information, other than the single incident in which the Plaintiff had
> accidently perforated the bowl of patient # 196208 Case 5, showing that Plaintiff
> definitively had failed to follow a standard of care.  No testimony or other evidence
> disputed the Plaintiff's explanations and testimony at the fair hearing.

*Id.* at 1235.

> Because one of the panel members had to leave, the panel decided that there
> was no need to review or discuss the three category–3 cases submitted by the PRC,
> and Dr. Donnell informed Plaintiff that they were going to conclude the hearing and
> "reconvene on Thursday just as a panel to discuss *what was discussed here today* "
> and reach their decision.  *Id.* at 155 (italics added).  Thus, the FHC reviewed a total
> of 9 cases, discussed *supra*, only one of which indicated that Plaintiff had perforated
> a bowel during laparoscopic lysis of adhesions (and, as the outside peer reviewer
> later noted, unless Plaintiff had a pattern of perforating bowels during those
> procedures, that may have been a one-time simple mistake).  As noted by the
> summary of the cases set out above, no surgical/ gynecological expert indicated that
> Plaintiff had fallen below the standard of care on any other kind of surgical or
> obstetrical proceeding or otherwise placed patients in danger. As noted, the PRC
> reviewers' most common complaint was Plaintiff's failure to fully document what
> he had done.

> But before the FHC reached a decision regarding a recommendation to the
> MEC and Board of Trustees, on December 17, 2008, Dr. Remillard wrote to the New
> Mexico Board of Medical Examiners to inform them of the two suspensions of
> Plaintiff's privileges.  Doc. 44, Ex. Q.

> The FHC panel reconvened on December 18 and made the following
> non-specific findings, none of which specifically concluded that Plaintiff had fallen
> below a standard of care:

>> (1) There was evidence of poor surgical judgment in several cases
>> involving the laparoscopic lysis of adhesions;

>> (2) There was evidence of poor obstetrical judgment in one case; and

(3) There was evidence of poor documentation of preoperative evaluations and of intraoperative surgical findings in several cases.

Doc. 44, Ex. W at 1.  Based on "the case reviews and these findings" the FHC panel made the following recommendations to the MEC and Board of Trustees.

(1) Restore [Plaintiff's] Gynecology privileges except for the laparoscopic lysis of adhesions.

(2) Institute ongoing focused chart review for [Plaintiff's] obstetric and gynecologic cases.

(3) Mandate additional education for [Plaintiff] with regard to the indications for and techniques of laparoscopic lysis of adhesion.

(4) Require additional education for [Plaintiff] focused on risk management and medical records documentation.

*Osuagwu*, 850 F. Supp. 2d at 1235-36[2].  The FHC, therefore, recommended rejection and modification of the MEC's November 24, 2008 summary suspension, as was its right under the Bylaws.  *See* Doc. 160-3 at 4, Ex. C at ¶ 8.5-11 ("The report may recommend confirmation, modification, or rejection of the original adverse recommendations or findings of the MEC . . . [which] shall be preliminary in nature, pending final action by the Board of Trustees"); Doc. 160 at 16, ¶ 18.

---

[2]  Although Defendants contend that the FHC met again on December 18, 2008 and considered the remaining two cases of the twelve on which Plaintiff was given notice but was not permitted to contest, *see* Doc. 160 at 7, ¶ 17, that contention is clearly belied by Dr. Donnell's statement to Plaintiff on the record quoted above.  Further, contrary to their citation of the Fair Hearing Committee Report in support of their contention, the Report does not state that all of the cases were discussed at the hearing.  Instead, the Report notes that 12 cases "were presented to" the FHC, but that "an intensive case review involving the most serious allegations was conducted by the panel, with Dr. Osuagwu giving explanations," after which the hearing was adjourned, and that the panel met again on December 18 for the purpose of "final deliberations and the preparation of a final report." Doc. 44-3 at 7, Ex. W at 1. There is, therefore, no genuine issue of material fact regarding the fact that the FHC considered only 9 cases and 10 allegations of problematic medical conduct, and that the FHC did not consider the two level-three cases that remained.

16

The MEC held a special meeting on December 29, 2008 to discuss the FHC's recommendations. *See* Doc. 160, Ex. B. Only five voting members were present: Drs. Koury, Carreon, Snure, Stinar, and Arizaga-Morales. *See id.* Only Dr. Carreon had attended part of the fair hearing, and none of the members are OB/GYNs. Dr. Remillard presented the findings of the FHC and brought to the MEC's attention that many of the cases the PRC listed as a "5" in terms of bad outcome had been downgraded[3]; and that Plaintiff was not the surgeon who perforated one of the patients' bowels. *See id.* But Dr. Remillard told the MEC that Plaintiff "did not recognize the complication and therefore did not manage the complication appropriately" for one of the bowel perforations – apparently referring to Plaintiff's failure to recognize that Dr. Nwachuku had apparently previously punctured the obese patient's bowel in the first surgery[4]. *Id.* And Dr. Remillard apparently did not inform the MEC about the undisputed evidence at the fair hearing demonstrating that Plaintiff had first consulted with Dr. Nwachuku about doing the follow-up laparoscopy (after Dr. Nwachuku's surgery) and that he also had

> ordered a second, post-laparoscopy CT scan late on September 4, which showed some "free air," so Plaintiff consulted with a radiologist, who did not think the "free air" was much to worry about because it could have been introduced during the laparoscopy. *See id.* at 100–102. Plaintiff requested pulmonary and internal medicine consults on September 5 after the patient experienced some breathing issues. *See id.* at 95. Plaintiff also requested a general surgical consult on September

---

[3]  In fact, as noted in my prior MOO, all of the cases the PRC reviewers listed as category 5 cases were downgraded to at least a 4. Category 4 cases indicated "some deviation from the standard of care with possible change of outcome," and category 5 cases indicated "deviation from the standard of care with probable change of outcome." Doc. 44, Ex. K1 at 2. The only case that was not specifically downgraded was Case 9 - #76636, in which Plaintiff had scheduled the obese patient for a laparoscopy but the anesthetist cancelled the surgery, so there could not have been a "probable change of outcome" adverse to the patient.

[4]  Dr. Remillard must have been talking about patient #41872 because Plaintiff was out of town, and Dr. Nwachuku performed the post-op care, of the only patient whose bowel Plaintiff apparently perforated.

17

5, but the surgeon did not suggest there could be a perforated bowel or that she be immediately transferred to a larger hospital.

*Id.* at 1226-27.  It is impossible to see how, under the undisputed evidence presented at the hearing, Dr. Remillard could fairly tell the MEC that Plaintiff did not properly handle the complications caused by Dr. Nwachuku's surgery.  After discussion, the MEC members indicated that their concerns were: "poor documentation; the need for in-depth continuous monitoring; and the need for further education."  Doc. 160, Ex. B.  They made no findings that Plaintiff was so incompetent that he was placing patients in imminent danger.  By a three-to-two vote, and despite the fact that neither the MEC, the FHC, nor any expert had ever made any findings that Plaintiff actually violated the standard of care for any patient; and,

> [d]espite the fact that Dr. Remillard, the only gynecologist on the FHC panel and Gila Regional's CMO, concurred in the FHC recommendations and signed off on them, the MEC sent a much harsher, more extensive set of recommendations to the Board that also affected Plaintiff's ability to practice obstetrics at Gila Regional.  *See* Doc. 44, Ex. N at 1, 6.  These recommendations included:
>
> > 1. Suspension of all gynecologic surgical privileges
> >
> > 2. Obtain consultations for all obstetrical patients with medical or surgical complications and consultations for all Special Care Unit admissions.
> >
> > 3. Send charts in question for outside review.
> >
> > 4. Ongoing focused review of all obstetric patients.
> >
> > 5. Six hours of Continuing Medical Education of Risk Management, including education on medical record documentation.
> >
> > 6. Before GYN privileges reinstated, additional education with regard to the indications for and techniques for all gynecological surgery and receipt of information from an educator that Dr. Osuagwu is competent to practice in a small town.

*Id.* at 1.

*Osuagwu*, 850 F. Supp. 2d at 1236.  The MEC gave no reasons in its minutes for ignoring the recommendations of the FHC, which was the **only** entity that had conducted a thorough review of the patient's charts and other hospital records, and the only entity that had heard Plaintiff's explanations.  Nor did it give any reasons for recommending imposition of these new, extremely harsh requirements for reinstatement of privileges, the last of which, Plaintiff contends, would be virtually impossible for a licensed doctor to achieve.  And this new set of recommendations contained new restrictions on Plaintiff's obstetrical practice that were never reviewed by the FHC before being sent to the Board.

The Board of Trustees held its hearing on February 2, 2009.  As I noted in my previous MOO, the Board's summary notebook, which its legal counsel apparently supplied to the Board for the hearing, contained many untrue statements about the prior proceedings.

> For example, it stated that the Plaintiff had "provided input on selection of the [peer] Committee members," see *id.* at 2, even though the Plaintiff had no idea that a PRC had been convened to evaluate all of his hospital records before issuance of the second sanction on November 24, 2008, and it stated that category 3 cases were reviewed "in detail" at the fair hearing, *see id.* at 5 even though the FHC had decided not to consider those cases and did not review them at the December 15, 2008 hearing.  In addition, the Board of Trustees considered case-note summaries of cases 1 and 2, which were category 3 cases that the FHC decided to disregard and about which Plaintiff had no opportunity to comment or defend at the fair hearing. *See id.* at 4.

> . . . .   [The case notes] included several cases that were never discussed at the fair hearing and several incorrect statements of fact that had been corrected at the fair hearing.  *See id.* at 3.

> For example, the summary of Case 4 stated as a criticism: "induction of labor in high-risk OB patient at [ ] 35 weeks gestation, pregnancy complicated by alcohol and methamphetamine use," *see id.* at 3, despite the facts that: 1) there was absolutely no evidence or testimony that the mother was high risk or had complications during her pregnancy; 2) Plaintiff testified that he had been the mother's OB physician since the first trimester; that she had been drug-free since her first trimester; and that her lab results continued to show no drug or alcohol in her system at the time he decided to induce, *see* Doc. 44, Ex. R at 64–65, 77; and 3) Dr.

19

Remillard had established at the fair hearing that inducing labor in that patient was the correct thing to do under the circumstances, *id*. at 77.

And the summary of Case 6 states the criticism of Plaintiff's treatment as, "Pelvic abscess: 5 days before infectious disease consult; 6 days before surgery consult." Doc. 44, Ex. N at 3. But undisputed testimony and evidence at the fair hearing had established that, after the pelvic abscess was removed, there were no further infection or surgical issues; that the patient's only problem after the abscess removal was that she could not urinate without a foley catheter; and that she was transferred at her request because she could not urinate. *See* Doc. 44, Ex. R at 134–37. The case-note summary also incorrectly stated that "no blood culture or urinalysis ordered," Doc. 44, Ex. N at 4, but as noted, *supra*, Plaintiff conclusively established at the fair hearing that he had obtained both blood cultures and urinalyses and the FHC panel extensively examined them.

At the February 4, 2009 hearing, contrary to Gila Regional's bylaws, the Board heard new evidence from Dr. Montoya, the only physician/member of the Board of Trustees, regarding two cases in which Dr. Montoya believed that Plaintiff's medical "performance was unsatisfactory," and Plaintiff was not permitted to challenge his testimony through cross-examination.

*Osuagwu*, 850 F. Supp. 2d at 1236. Defendants now suggest (without submitting any documentary evidence other than Plaintiff's deposition statements) that Dr. Montoya's testimony was unsworn and, therefore, only represented his opinion, which, they contend, he had a right to provide at the hearing. *See* Doc. 160 at 9, ¶ 25. But Dr. Montoya's testimony did **not** represent an opinion as a Board member that the MEC's recommendations should be adopted – and, in fact, he voted that they should **not** be adopted. *See* Doc. 160, Ex. D at 3. Rather, his opinion was given to the Board as an OB/GYN, not just as a Board member, and went to the heart of whether Plaintiff's performance supported the new extreme sanctions recommended by the MEC. *See* Doc. 135 at 29, Ex. BBB (Dr. Osuagwu's unrebutted affidavit stating that at the February 4, 2009 hearing before the Board, "Dr. Montoya testified that only two of the thirteen cases he reviewed in connection with the peer review process were not in agreement with the standard of care"). Again, to this point, not a single medical expert or OB/GYN had testified that Plaintiff's performance fell below an acceptable standard of

care such that he was likely to place future patients in imminent danger.  And, as Plaintiff points out, accidently perforating a bowel during a difficult surgery does not automatically mean that a doctor is incompetent - otherwise, Dr. Nwachuku similarly would have been suspended and placed under investigation because he was the lead surgeon in case number 196208, where the bowel was perforated, and no action has been taken against him.  As Defendants note, the Bylaws precluded the Board from hearing any new evidence that Plaintiff had not had an opportunity to cross-examine, and they admit that Plaintiff was not allowed to challenge Dr. Montoya's statements.  *See* Doc. 160 at 9, ¶ 25.

The Board had before it three recommendations - those of its FHC, which recommended rejection and modification of the MEC's November 24, 2008 summary suspension, which had expired, and the new, harsher, December 30, 2008 recommendations of its MEC, some of which, contrary to the Bylaws, had never been considered and reviewed by the FHC.  *See* Doc. 160, Ex. C at 3, ¶ 8.5-11; Doc. 44-3 at 7, Ex. W (Report of the Fair Hearing Panel submitted to the Board).  The Bylaws further mandated that, instead of recommending **new** sanctions, the MEC had to provide a recommendation to the Board **regarding the acceptance, rejection, or modification of the FHC's recommendations**, and that the Board could not "take final action relative to the recommendations of the hearing committee prior to receipt of a recommendation from the MEC." *Id.*, ¶¶ 8.5-12; Doc. 160 at 17, ¶ 20.  There is no evidence in the record that the MEC ever sent a recommendation to the Board regarding whether the Board should accept the FHC's recommendations that rejected and modified its November 24, 2008 suspension recommendations.  Instead, the only document the MEC apparently prepared and submitted to the Board is their December 30, 2008 recommendations for **harsher** sanctions.  *See* Doc. 44 at 23, Ex. N at 23 (Board's notebook setting out the MEC's December 29, 2008 recommendation); Doc. 57, Ex. 4 (MEC's Dec. 30, 2008 letter to Plaintiff

stating that it had met to consider the FHC's recommendations, containing no comment regarding the FHC's recommendations, and the list of harsher recommendations, including some never before suggested in any other document).   The Board never acted on the FHC's recommendations. Incredibly, citing only subsection 8.6-7 of the Bylaws and ignoring subsections 8.5-11 and -12, which require final action of the Board on the FHC's recommendations when they recommend modification or rejection of the MEC's recommendations, Defendants argue that the Board's authority was limited to "confirming, modifying, or rejecting the MEC's proposed adverse decision," and that the "specific question whether to adopt the FHC's recommendation was never before the Board." Doc. 160 at 9, ¶ 24.  I reject Defendants' interpretation of the Board's authority and duty because it is contrary to the express language of the Bylaws.

It is undisputed that medical employers, including hospitals, are "obligated by law to inquire into any disciplinary or adverse action prior to granting employment or hospital privileges to physician applicants, and this impacts negatively on an applicant's chances of being employed or obtaining hospital privileges if the applicant has been the subject of a disciplinary action." Doc. 135 at 10, ¶ 44.  It is also undisputed that, "even after the Report of Adverse Action is expunged completely from the records of the National Practitioner Data Bank, Plaintiff would still be obligated to admit to a history of adverse action (and provide details of it), whenever he applies for employment or clinical privileges in the future." *Id.* at 11, ¶ 44.  It is undisputed that Plaintiff has applied for hospital privileges with another hospital, but was not granted privileges because of the National Practitioner Data Bank Adverse Action Report that Dr. Remillard submitted on behalf of Gila Regional.  *See* Doc. 160, Ex. E.  Plaintiff  has presented undisputed evidence from a recruiter with whom he obtained his position at Gila Regional that, when a physician's hospital privileges have been revoked, that physician "will be considered last [for employment] in almost every case."

22

Doc. 44-3 at 18, Ex. Z.

II.    **Analysis**

A.    **Plaintiff has a constitutionally-protected property interest in the medical privileges that Gila Regional granted to him**.

In my March 27, 2012 MOO denying immunity under HCQIA to Gila Regional and its

agents, I noted:

> The Eleventh, Sixth, and Fifth Circuits have explicitly held that a physician has a constitutionally-protected property interest in medical-staff privileges where the hospital's bylaws detail an extensive procedure to be followed when corrective action or suspension or reduction of these privileges is going to be taken. *See Shahawy v. Harrison*, 875 F.2d 1529, 1532 (11th Cir. 1989) (holding that a physician has a "constitutionally-protected property interest in medical staff privileges"); *Yashon v. Hunt*, 825 F.2d 1016, 1022–27 (6th Cir. 1987); *Northeast Ga. Radiological Assoc. v. Tidwell*, 670 F.2d 507, 511 (5th Cir. Unit B 1982) ("Medical staff privileges embody such a valuable property interest that notice and hearing should be held prior to [their] termination or withdrawal, absent some extraordinary situation where a valid government or medical interest is at stake."). The Tenth Circuit has noted this property interest in at least one case in which the parties conceded the interest exists. *See Setliff v. Mem'l Hosp. of Sheridan County*, 850 F.2d 1384, 1395 (10th Cir. 1988).

*Osuagwu*, 850 F. Supp. 2d at 1223. I noted, however, that "[t]he Defendants have not challenged

Plaintiff's right to constitutional due process either in this summary-judgment motion or in their

previous motion to dismiss, and the time for filing further pre-trial motions has expired." *Id.* Gila

Regional now contends, in response to Plaintiff's motion for summary judgment, that Plaintiff

"cannot establish that he had a property right in his medical staff privileges," Doc. 160 at 2, and

argues that, because HCQIA immunity standards "are different" from those establishing violation

of procedural due process rights, the Court's March 27, 2012 MOO and due-process analysis "is not

determinative" of Plaintiff's § 1983 claims against any Defendant. *Id.* at 21.

Defendants contend that Plaintiff cannot establish that his medical privileges are a protected

property interest because "property cannot be defined by the procedures provided for its

deprivation." Doc. 160 at 25 (quoting *Loudermill*, 470 U.S. at 541). As noted above, however, the medical-services contract between Plaintiff and Gila Regional expressly provides that it could only be terminated either by mutual consent or "for cause-specified," and medical privileges are a necessary adjunct to that contract for services. Doc. 162, Ex. GGG at 1; Doc. 160 at 13, ¶ 3. Further, Defendants fail to acknowledge that Gila Regional's Bylaws, which controlled Plaintiff's ability to provide medical services through Gila Regional, specifically restricted Gila Regional's authority to summarily suspend hospital privileges without notice and specific findings, permitting such summary suspension only when "the failure to take such action may result in imminent danger to the health of any individual and otherwise be in the best interest of patient care at [Gila Regional]." Doc. 44, Ex. J at 1, ¶ 7.2-1; *see id.* (providing that summary suspension would "automatically expire if not at the end of fourteen (14) days extended by action of the MEC pursuant to [subsection 7.2-2]"); *see also* Doc. 160, Ex. 3 at 7 (Bylaws provision stating that the MEC's actions in reviewing, disciplining, and making recommendations for suspension or discipline are "subject to the limitations imposed by these Bylaws"). The Bylaws, therefore, also place substantive restrictions on the authority of the MEC to suspend a doctor's medical privileges.

Plaintiff has provided evidence as to the length and terms of his initial appointment and to his contractual right to work at Gila Regional unless Gila Regional showed specific cause to terminate the contract and privileges. Gila Regional supplied Plaintiff with Bylaws that carefully restrict the termination or suspension of staff privileges and provide specific procedures to be followed in disciplinary or suspension actions. He has, therefore, established that he has a constitutionally-protected property right in his medical privileges. *See Hulen*, 322 F.3d at 1240; *cf. Le Baud v. Frische*, No. 97-6109, 156 F.3d 1243, 1998 WL 537504, *3 (10th Cir. Aug. 20, 1998) (unpublished) (noting, in termination-of-medical-privileges case that, "if a statute, regulation, or

policy specifies the grounds on which an employee may be discharged, or restricts the reasons for discharge to 'just cause shown,' then the employee has a right to continued employment until such grounds or causes are shown."); *cf. Custodio*,1995 WL 523123, *3 (noting that "hospital privileges created by the provision for extensive grievance procedures combined with substantive restrictions on dismissal contained in the bylaws for the medical staff" could create protected property rights, but because doctor had not passed his probationary period and had not been granted "defined privileges" at the time of his termination, he could not claim a protected property interest).

### B.   Gila Regional violated Plaintiff's due process rights, and wrongfully suspended and terminated his hospital privileges.

I concluded in the March 27, 2012 MOO that because the MEC was initially concerned with imminent danger to patient safety, "it was not necessary for the MEC to give Dr. Osuagwu pre-deprivation notice and a hearing before it temporarily suspended his privileges and imposed other restrictions pending further investigation."  *Osuagwu*, 850 F. Supp. 2d at 1238-39.  I noted:

> "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L.Ed.2d 484 (1972). The Supreme Court has repeatedly held, "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L. Ed. 2d 120 (1997). Furthermore, "[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Id.* at 930–31, 117 S.Ct. 1807.
>
> "In matters of public health and safety, the Supreme Court has long recognized that the government must act quickly. Quick action may turn out to be wrongful action, but due process requires only a postdeprivation opportunity to establish the error." *Camuglia,* 448 F.3d at 1220 (citing *North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 315, 29 S.Ct. 101, 53 L.Ed. 195 (1908)).

*Id.* at 1223-24.  Here, Plaintiff's summary suspension involved **not only** a deprivation of his

property rights, but also, because of the mandatory reporting requirements to the State's Medical Board and National Practitioner Data Bank, inevitable damage to his liberty interest in his reputation and ability to find subsequent employment.  Accordingly, the pre-and-post-deprivation processes provided by Gila Regional's Bylaws were critically important to avoid an erroneous deprivation.  *See Matthews*, 424 U.S. at 334-35.   As noted, *supra*, it is an "essential principle of due process . . . that a deprivation of . . . property be preceded by notice and opportunity for hearing appropriate to the nature of the case," *Loudermill*, 470 U.S. at 542 (internal quotation marks omitted).   The temporary 14-day suspension, as noted in the hospital's November 17, 2008 letter to Plaintiff, was not reportable **until** the point at which the MEC extended it.  There was a two-week window of time, therefore, during which the hospital could protect its patients by prohibiting Plaintiff from performing elective laparoscopies and requiring oversight by a more experienced doctor on non-elective ones, which served its important government interest.  During this time, although Plaintiff could lose income from not being able to perform elective laparoscopies, he would not suffer permanent consequences to his reputation as a medical doctor. Nevertheless, before November 17, no investigation into Plaintiff's abilities had been done by the MEC, so the risk of an erroneous deprivation was high.  Therefore, pre-deprivation process was constitutionally required before the MEC took steps to **extend** the summary suspension, which would have to be reported to the New Mexico Medical Board as an adverse action that would permanently call into question Plaintiff's abilities as a specialized practitioner, and thus would significantly infringe on Plaintiff's right to treat his patients.  *See Matthews*, 424 at 334-35.

Citing *Guttman v. Khalsa*, 669 F.3d 1101 (10th Cir. 2012), Defendants argue that "due process required only a post-deprivation opportunity to establish whether the suspension of Plaintiff's privileges was in error." Doc. 160 at 36.  But, unlike in this case, the physician in

Guttman was given a *pre-deprivation* opportunity to meet with the Impaired Physician Committee and to answer questions during its investigation and *before* the IPC issued a report that resulted in the Medical Board's summary suspension of his medical license.  *See Guttman*, 669 F.3d at 1106-1107.  And *before* issuing the summary suspension, the Medical Board made a formal finding of "clear and convincing evidence that 'Guttman's continuation in practice would constitute an imminent danger to public safety.'" *Id.* at 1107.  In the subsequent, post-deprivation proceedings, "the Board conducted a three-day administrative hearing to take evidence on whether the suspension should be made permanent." *Id.*

Consistent with the mandates of minimum constitutional due-process protections discussed in *Guttman*, Gila Regiona's Bylaws properly required the MEC – *before* extending the summary suspensions and thereby making them reportable adverse actions with a permanent, negative impact on Plaintiff's future employment as a doctor – to give Plaintiff an informal opportunity, within 5 days of the adverse summary suspension action, to know exactly what facts formed the basis of the summary suspension, and to give the MEC relevant information about the cases and his medical decisions.  *See* Doc. 162-1 at 10-11, ¶ 7.2-2.  As noted above, the MEC utterly disregarded these required procedures by failing to give Plaintiff any notice of the specifics of the alleged deficiencies in his performance, or an opportunity to explain and support his performance with documentation.  For these reasons, by the very operation of the Bylaws themselves, the November 17, 2008 and November 24, 2008 suspensions automatically expired at the end of 14 days.  *See id.* at 10, ¶ 7.2-1.  In violation of the Bylaws and Plaintiff's constitutional right to pre-deprivation process, the MEC extended the suspensions anyway.  Thus, although Gila Regional could initially summarily and temporarily suspend Plaintiff without a pre-deprivation notice and a hearing, its unlawful extension of those suspensions violated his right to due process as a matter of law.  The same is true for the

November 24, 2008 summary suspension.  Again, Plaintiff was given no pre-deprivation notice that the MEC was going to significantly broaden and expand the suspension, or that it was going to permanently extend the original suspension, making it a reportable adverse event.

Further, it is now clear that the MEC's December 29, 2008 recommendations were issued without process of any kind, and thus unlawfully violated Plaintiff's due-process rights. Specifically, these recommendations were not submitted until **after** the December 16, 2008 hearing. Plaintiff was never given an opportunity to challenge, under the pre-or-post-deprivation procedures set forth in the Bylaws, any of these recommendations.  As noted above, following the hearing, the MEC's authority was limited to commenting on the FHC's recommendations and, in the case of its disagreement with them, explaining to the Board why it should instead adopt **its** expired November 24, 2008 recommendations. Once Plaintiff had no further opportunity to challenge the expired November 24, 2008 MEC recommendations, the MEC had no authority to issue new recommendations for permanent suspension and readmission requirements.  Moreover, the Board never acted on the expired November 24, 2008 recommendations or the FHC's December 18, 2008 recommendations.  Instead, it adopted the MEC's December 29, 2008 **new** recommendations, which had never been tested through the due-process procedures set forth in the Bylaws.  *See* Doc. 160 at 18, ¶ 27.  As a matter of law, the Board's adoption of the December 29, 2008 recommendations was invalid, and violated Plaintiff's right to constitutional due process.

Defendants also argue that the FHC's post-deprivation process was sufficient to protect Plaintiff's due-process rights because it reviewed nine of the twelve[5] cases at the hearing and later

---

[5]  Defendants confuse the number of cases in which Plaintiff was accused of substandard performance at the hearing, which was 10, with the number of patient charts associated with those cases, which was 9.  The MEC/PRC submitted twelve patient charts to the FHC, but the FHC reviewed only 9 of them at the hearing, and when they ran out of time, decided not to review the

reviewed the other cases at an ex-parte hearing.  *See* Doc. 160 at 36-37.  As noted, *supra*, it appears

to be undisputed in the record that the FHC did *not* review any patient charts *ex parte*.  If they had,

as a matter of law, that action alone would violate due process because:

> where governmental action seriously injures an individual, and the reasonableness
> of the action depends on fact findings, the evidence used to prove the Government's
> case must be disclosed to the individual so that he has an opportunity to show that
> it is untrue.  While this is important in the case of documentary evidence, it is even
> more important where the evidence consists of the testimony of individuals whose
> memory might be faulty or who, in fact, might be perjurers or persons motivated by
> malice, vindictiveness, intolerance, prejudice, or jealousy.  We have formalized these
> protections in the requirements of confrontation and cross-examination. They have
> ancient roots. They find expression in the Sixth Amendment which provides that in
> all criminal cases the accused shall enjoy the right 'to be confronted with the
> witnesses against him.' This Court has been zealous to protect these rights from
> erosion. It has spoken out not only in criminal cases, but also in all types of cases
> where administrative and regulatory actions were under scrutiny.

*Greene v. McElroy*, 360 U.S. 474, 496-97 (1959) (footnote and citations omitted).

Defendants also contend that Plaintiff received adequate due process because he had an

opportunity to "present evidence and call witnesses relating to any of the cases." Doc. 160 at 37.

But Plaintiff was put at a severe disadvantage because the MEC had never specified its concerns

with Plaintiff's performance before the hearing, other than in vague terms, and did not present

anything other than the anonymous peer-review forms and Dr. Carreon's summary at the hearing.

Plaintiff had to take a shotgun approach at attempting to defend himself because he was not

permitted to cross-examine the reviewers who made the notes accusing him of substandard medical

care, or the doctors who allegedly told members of the PRC that they had never perforated a bowel

while performing a laparoscopy.   This violated due process under *Greene*.

Defendants now contend that the MEC could not bring those reviewers to the hearing

---

other three charts because the PRC had given those charts ratings of a 3, which were not serious.

because "'physicians participating in a peer review are not allowed to disclose what transpired . . . '" Doc. 160 at 37; *id.* at 7, ¶ 19. But, as Defendants themselves point out, the peer-review participants *may* testify when it is necessary to carry out the purposes of the review organizations, or when the accused physician appeals from the rulings of the organization. *See id.* (citing N.M.S.A 1978, § 41-9-5(A)). Because, under the Bylaws, the MEC was *required* to present witnesses or testimony at the fair hearing to support their adverse recommendations, the confidentiality provisions of § 41-9-5(A) do not apply. I adopt and incorporate my prior findings and conclusions in this regard:

> The MEC did not call any expert witnesses or other gynecologists to testify about substandard surgical, gynecological, or obstetrical practices, nor did it present any reports or other information, other than the single incident in which the Plaintiff had accidently perforated the bowl of patient # 196208 Case 5, showing that Plaintiff definitively had failed to follow a standard of care. No testimony or other evidence disputed the Plaintiff's explanations and testimony at the fair hearing. By failing to bring to Plaintiff's disciplinary hearing the PRC physician-reviewers who expressed their opinions that Plaintiff's performance fell below the standard of care, and by failing to bring in the other physicians who allegedly informed the MEC and PRC members that Plaintiff had committed errors by failing to consult, Gila Regional and its MEC deprived Plaintiff of an opportunity to cross-examine the witnesses against him. As a matter of law, this failure violated Plaintiff's rights of cross-examination under both the Bylaws and the minimum standards of constitutional due process.

*Osuagwu*, 850 F. Supp. 2d at 1235. Defendants dispute the Court's finding that no medical expert or any committee ever established that Plaintiff's had failed to follow a standard of care, contending that in the FHC's report, "it was determined medical care was outside the accepted standard of care." *See* Doc. 160 at 7, ¶ 18. But the FHC Report contained findings only that "[t]here was **evidence** of poor surgical judgment in several cases involving the laparoscopic lysis of adhesions," "[t]here was **evidence** of poor obstetrical judgment in one case; and "[t]here was **evidence** of poor documentation." Doc. 44-3 at 7, Ex. W (emphasis added). It made no findings that Plaintiff's performance actually fell below any standard of care.

I made several other legal conclusions regarding constitutional due process in the March 27, 2012 MOO. I noted:

> . . . Dr. Remillard played roles as Dr. Oswagwu's accuser and "expert witness" against him, by virtue of his involvement in the MEC and PRC committees; as his prosecutor and as an unsworn witness at the Fair Hearing; and as a judge at the Fair Hearing. Although [it appears that] Gila Regional's Bylaws do not preclude its Chief Medical Officer's involvement in every stage of an investigation, disciplinary sanction, and "fair" hearing to determine if the sanction was appropriate, minimal constitutional due-process standard does preclude involvement to this degree. "[T]he Due Process Clause of the Fifth Amendment guarantees a hearing concerning the deprivation of . . . a recognized property or liberty interest before a fair and impartial tribunal. This guarantee applies to administrative adjudications as well as those in the courts." *Harline v. Drug Enforcement Admin.* 148 F.3d 1199, 1203 (10th Cir. 1998) (internal citations omitted). Even in the context of a prison disciplinary hearing,
>
> > [a]n impartial hearing board has been required, to the extent that a member of the board may not participate in a case as an investigating or reviewing officer, or be a witness. The Third Circuit, . . . has also held, in the context of the federal system where a prisoner whose good time is taken away goes first to a disciplinary committee and then to the Good Time Forfeiture Board, that an associate warden could not sit on both committees.
>
> *Wolff v. McDonnell*, 418 U.S. 539, 572 n.20 (1974); *id.* at 592 (Marshall, J., concurring) ("Due process is satisfied as long as no member of the disciplinary board has become involved in the investigation or presentation of the particular case or has any other form of personal involvement in the case."). As a matter of law, Gila Regional and its MEC cannot show that it afforded a fair hearing by impartial decisionmakers to Plaintiff when it conducted the disciplinary proceedings in this fashion.

*Id.* at 1230-31. Defendants now assert that the MEC, not Dr. Remillard, was Plaintiff's accuser. Doc. 160 at 38. But Defendants cannot dispute the fact, clearly revealed in the transcript of the hearing, that Dr. Remillard took over the accuser/prosecuting role for the MEC when Dr. Carreon left. And at the hearing, Dr. Remillard defended the MEC's decision not to follow the Bylaw's procedure requiring the MEC to notify Plaintiff of the specific charges against him and permit him to defend against them before the MEC extended the suspension. *See* Doc. 44, Ex. R. at 31-33.

31

Defendants further assert that the PRC, and not Dr. Remillard, was the investigator, but an entity can act only through its members, and it is undisputed and clear in the hearing transcripts that Dr. Remillard was a voting member of the PRC and played a very active part in the investigation and presentation to the MEC that led to the much harsher, November 24, 2008 recommendations, and that he presented the information about what occurred at the hearing to the MEC on December 29, 2008, before it imposed the new, harsher suspension and admission requirements.

Citing *Withrow v. Larkin*, 421 U.S. 35 (1975), and a 1978 case from the District of North Carolina[6] in which the district court found itself "bound by [*Withrow*'s] holding that the combination in an agency of investigative and adjudicatory functions does not itself violate due process," Defendants contend that permitting one individual to play the parts of accuser, investigator, prosecutor, and judge does not violate due process. *See Doc.* 160 at 38. *Withrow* is easily distinguished. There, a Medical Board, proceeding under a state statute, informed the physician that it was going to hold an "investigative hearing . . . to determine whether he had engaged in certain proscribed acts. . . . Based upon the evidence presented at the hearing, the Board would decide 'whether to warn or reprimand if it finds such practice and whether to institute criminal action or action to revoke license if probable cause therefor exists under criminal or revocation statutes.'" 421 U.S. at 39. After the hearing, the Board filed a complaint against the physician "for the purpose of initiating an action to revoke the [physician's] license . . . to practice medicine and surgery in the State of Wisconsin . . . . " *Id.* The constitutional issue presented was "whether 'for the board temporarily to suspend [the physician's] license at its own contested hearing on charges evolving

---

[6] Although Defendants cite to *Hoke v. Bd. of Med. Exam'rs*, 445 F. Supp. 1313 (D.C.N.C. 1978), the ruling referred to was actually made in an earlier opinion, *Hoke v. Bd. of Med. Exam'rs*, 395 F. Supp. 357 (W.D.N.C.1975). *See* 445 F. Supp. at 1315.

from its own investigation would constitute a denial to him of his rights to procedural due process.'" *Id.* at 46.  The District Court granted injunctive relief to preclude enforcement of the state statute providing the procedure the Board followed, concluding that, "(F)or the board temporarily to suspend [the physician's] license at its own contested hearing on charges evolving from its own investigation would constitute a denial to him of his rights to procedural due process." *Id.* at 42. The Supreme Court first noted that, "[c]oncededly, a fair trial in a fair tribunal is a basic requirement of due process.  This applies to administrative agencies which adjudicate as well as to courts.  Not only is a biased decisionmaker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness." *Id.* at 46-47 (internal quotation marks and citations omitted).  But it held that, *in the context* before it of a *pre-deprivation* administrative hearing to determine whether sufficient evidence existed to file a complaint seeking to permanently suspend a medical license, "the combination of investigative and adjudicative functions" did not violate due process. *See id.* at 47-50.   The Court in *Withrow* distinguished its holding from the holding in *In re Murchison*,

> in which a state judge, empowered under state law to sit as a 'one-man grand jury' and to compel witnesses to testify before him in secret about possible crimes, charged two such witnesses with criminal contempt, one for [perjury] and the other for refusing to answer certain questions, and then himself tried and convicted them. This Court found the procedure to be a denial of due process of law not only because the judge in effect became part of the prosecution and assumed an adversary position, but also because as a judge, passing on guilt or innocence, he very likely relied on 'his own personal knowledge and impression of what had occurred in the grand jury room,' an impression that 'could not be tested by adequate cross-examination.' 349 U.S., at 138, 75 S.Ct., at 626.

*Withrow*, 421 U.S. at 53.

In contrast with *Withrow*, here, as in *Murchison*, the challenged action is that of a final decision-maker acting as accuser, prosecutor, investigator, and judge in a proceeding that could

33

result in a permanent loss of liberty or property.  *See Wolff*,  418 U.S. at 592 ("Due process is satisfied as long as no member of the disciplinary board becomes involved in the investigation or presentation of the particular case or has any other form of personal involvement in the case."). *Withrow* stands only for the unremarkable proposition that a medical board is permitted to make findings, based on a *pre-deprivation* probable-cause investigation, that suspension proceedings should go forward to determine whether permanent suspension should result.  That proposition is not challenged here.

Finally, Defendants contend that Plaintiff waived his due-process claim because he did not object to Dr. Remillard being on the FHC panel.  *See* Doc. 160 at 39.  But at the time Plaintiff received notice that Dr. Remillard would be a judge on the panel, he had no knowledge of the extent to which Dr. Remillard's would participate in the MEC and PRC proceedings, and certainly could not have anticipated that Dr. Remillard would also present the MEC's case against him, acting as an unsworn witness at the hearing.

## CONCLUSION

The Court finds that the MEC violated Plaintiff's rights to due process by: (i) extending the November 17, 2008 summary suspension, which had expired by operation of the Bylaws; (ii) imposing harsher, extended suspensions on November 24, 2008, without first making a finding that Plaintiff had ever placed patients in imminent danger, or giving Plaintiff pre-deprivation notice of the charges against him; and (iii) reporting the adverse action to the New Mexico Medical Board, based on suspensions that had automatically expired under operation of the Bylaws.  Further, the Court finds that Gila Regional Medical Center, through its MEC, Board, and FHC, violated Plaintiff's due-process rights in the post-deprivation proceedings by (i)  allowing Dr. Remillard to serve as accuser, investigator, prosecutor, and judge and; (ii) refusing to produce the reviewers and

34

other physicians who had accused, or allegedly had accused, Plaintiff of substandard medical practices. Finally, the Court finds that the Board violated Plaintiff's post-deprivation due-process rights by: (i) considering evidence against which Plaintiff was never given the opportunity to defend or dispute, including at least two cases and Dr. Montoya's opinion as an expert; (ii) failing to rule on the FHC's recommendations to reject the MEC's November 24, 2008 recommendations, which had expired; and (iii) adopting the MEC's December 29, 2008 recommendations for suspension, which Plaintiff was never allowed to challenge through any process, and which had no support in the evidentiary record.

**IT IS THEREFORE ORDERED** that: (i) Plaintiff's motion for summary judgment [Doc. 135] is GRANTED IN PART as to Gila Regional Medical Center on his § 1983 claims for violation of his right to due process; and (ii) Gila Regional Medical Center's cross-motion for summary judgment [Doc. 160] on these claims is DENIED.

**IT IS FURTHER ORDERED** that, within ten days of the filing of this Opinion, the Board of Trustees at Gila Regional Medical Center shall reinstate Plaintiff's medical privileges, and prepare and send the necessary documentation to recall and retract its adverse reports to the New Mexico Medical Board and the National Practitioner Data Bank, attaching to its letters this Opinion and the Court's March 27, 2012 Opinion.

**DATED** this 21st day of December, 2012.

_____

**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**

*Attorneys for parties*:

Dr. Chinonyerem Osuagwu, *pro se*
6240 Indian School Rd. NE, # B325
Albuquerque, NM 87110

*Attorneys for Defendant Gila Regional:*

Candace J Cavanaugh
Butt Thornton & Baehr PC
4101 Indian School Rd. NE, # 300S
Albuquerque, NM 87110

*Attorneys for the Individual Defendants*:

Kevin J. Banville
Seth Sparks
Shannon Sherrell
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Post Office Box 1888
Albuquerque, NM 87103