IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHINONYEREM OSUAGWU,

    Plaintiff,

vs.                                                                                 No. 11cv1 MV/SMV

GILA REGIONAL MEDICAL
CENTER, JEAN REMILLARD, M.D.;
GREGORY KOURY, M.D.;
MICHAEL SERGEANT, M.D.;
MARK DONNELL, M.D.;
RONALD DEYHLE, M.D.;
DON WHITE,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants Dr. Jean Remillard's, Dr. Gregory Koury's, Dr. Michael Sergeant's, Dr. Mark Donnell's, Dr. Ronald Deyhle's, and Don White's *Motion for Summary Judgment*, filed December 20, 2012 (Doc. 196). The motion raises a single issue: whether these Defendants are individually shielded from suit because pro-se Plaintiff Dr. Chinonyerem Osuagwu signed a contract agreeing to be bound by Article XIV of the Medical Staff Bylaws of Gila Regional Medical Center ("Gila Regional"), which grants to them absolute immunity from suit under the condition that they have acted in good faith and without malice and at the behest of Gila Regional. The Court will grant summary judgment on all claims in favor of Defendants Sergeant, Donnell, and Deyhle because there is nothing in the record to show that they may have acted in bad faith or with malice. The Court will deny summary judgment in favor of Defendants Remillard, Koury, and White, however, because either they acted without authority or because there are genuine issues of material fact whether these individuals acted in good faith and without malice during these proceedings.

**I. Applicable Standards.**

> On a motion for summary judgment , the Court
>
> view[s] the evidence and its reasonable inferences in the light most favorable to the non-movant. Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of fact is material "if under the substantive law it is essential to the proper disposition of the claim."

*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citations omitted). The ultimate inquiry in a summary-judgment disposition is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).[1]

**II.    General Undisputed Facts.**

Plaintiff has sued Gila Regional and the individual Defendants for violation of his Fourteenth Amendment right to procedural due process under 42 U.S.C. § 1983, and he has also sued the individual Defendants for intentional infliction of emotional distress, defamation, and malicious abuse of process under state law. The Court has already granted summary judgment in favor of Plaintiff on his § 1983 claim against Gila Regional. Specifically, I found that Gila Regional, acting through its Medical Executive Committee ("MEC"), of which Dr. Sergeant and Dr. Koury were both members and for which they temporarily served as the head for a period of time, its Fair Hearing Committee ("FHC"), and its Board of Trustees

---

[1] "Rule 56 was amended, effective December 1, 2010. Under the amended rule, the standard previously enumerated in subsection (c) was moved to subsection (a), and the term genuine 'issue' became genuine 'dispute.' *See* Fed. R. Civ. P. 56 advisory committee's notes (2010 Amendments). However, the 'standard for granting summary judgment remains unchanged.' *Id.*" *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 n.8 (10th Cir. 2011)

>violated Plaintiff's rights to due process by: (i) extending the November 17, 2008 summary suspension, which had expired by operation of the Bylaws; (ii) imposing harsher, extended suspensions on November 24, 2008, without first making a finding that Plaintiff had ever placed patients in imminent danger, or giving Plaintiff pre-deprivation notice of the charges against him; and (iii) reporting the adverse action to the New Mexico Medical Board, based on suspensions that had automatically expired under operation of the Bylaws.  Further, the Court finds that Gila Regional Medical Center, through its MEC, Board, and FHC, violated Plaintiff's due-process rights in the post-deprivation proceedings by (i) allowing Dr. Remillard to serve as accuser, investigator, prosecutor, and judge and; (ii) refusing to produce the reviewers and other physicians who had accused, or allegedly had accused, Plaintiff of substandard medical practices.  Finally, the Court finds that the Board violated Plaintiff's post-deprivation due-process rights by: (i) considering evidence against which Plaintiff was never given the opportunity to defend or dispute, including at least two cases and Dr. Montoya's opinion as an expert; (ii) failing to rule on the FHC's recommendations to reject the MEC's November 24, 2008 recommendations, which had expired; and (iii) adopting the MEC's December 29, 2008 recommendations for suspension, which Plaintiff was never allowed to challenge through any process, and which had no support in the evidentiary record.

December 21, 2012 Memorandum Opinion & Order ("Opinion") at 34-35 (Doc. 198).  The Court required Gila Regional to "reinstate Plaintiff's medical privileges, and prepare and send the necessary documentation to recall and retract its adverse reports to the New Mexico Medical Board and the National Practitioner Data Bank, attaching to its letters this Opinion and the Court's March 27, 2012 Opinion."  *Id.* at 35.  The individual Defendants now assert that they are absolutely immune from suit on all of the Plaintiff's claims.

As part of his contract to provide medical services for Gila Regional in exchange for guaranteed income of $22,500/month, Plaintiff executed an agreement stating that he would be bound by Gila Regional's Bylaws.  *See* Doc. 196, Ex. C at 2, ¶ 5; *id.* Ex. A at 4-5; Doc. 199 at 8, ¶¶ 10-11.  The Bylaws in effect at this time contain an immunity provision providing:

>ARTICLE XIV IMMUNITY FROM LIABILITY
>
>14.1  Article XIV, shall be express conditions to any practitioner's application for or exercise of clinical privileges at GRMC.
>14.2  That any act, communication, report, recommendation or disclosure, with

>respect to any such practitioner, performed or made in good faith and without malice and at the request of an authorized representative of this or any other health care facility, for the purpose of achieving and maintaining quality patient care in this or any other health care facility, shall be privileged.
>14.3 That such privilege shall extend to members of the hospital's Medical Staff and of its Board of Trustees, its CEO and representatives, and to third parties who may be authorized to receive, release or act upon the same.
>14.4 That there shall, to the fullest extent permitted by law, be absolute immunity from civil liability arising from any such act, communication, report, recommendation or disclosure, even where the information involved would otherwise be deemed privileged.
>14.5 That such immunity shall apply to all acts, communications, reports, recommendations or disclosures performed or made in connection with this or any other health care institutions activities related, but not limited, to:
>
>>. . . .
>>14.5-3 corrective action, including summary suspension, [and]
>>14.5-4 hearings and appellate reviews[.]

Doc. 196, Ex. D at 3-4.

During the time period in question, Dr. Remillard was Gila Regional's Chief Medical Officer ("CMO"), Dr. Koury also served as the head of its Peer Review Committee ("PRC"), and by December 29, 2008 he was the acting Chief of Staff (which automatically made him head of the MEC), *see* Doc. 160, Ex. B; Dr. Sergeant was Gila Regional's acting Chief of Staff/head of the MEC[2] in November 2008, and a member of the MEC; Dr. Donnell was the Hearing Officer who presided over the "Fair Hearing;" Dr. Montoya was a member of the Board of Trustees and also attended a meeting of the MEC and served on the PRC, *see* Doc. 44-2 at 3; *id.* 44-2 at 8; and Mr. White was the Chairman of the Board of Trustees. *See* Doc. 196 at 3-4, ¶¶ 4-9; Doc. 199 at 7-8, ¶¶ 4-9. Dr. Deyhle was an Outside Peer Reviewer hired by Gila Regional to conduct an independent review of several of Plaintiff's patients' medical records, but it is undisputed that Deyhle did not

---

[2] On November 17, 2008, the Chief of Staff was Dr. Twana Sparks, but she had been replaced by Dr. Sergeant by November 24, 2008, and then Dr. Koury became acting Chief of Staff by December 29, 2008. *See* Doc. 57, Exs. 1, 2.; Doc. 160, Ex. B.

conduct his review until February 6, 2009, two days after the Board of Trustees finally voted to permanently suspend Plaintiff's hospital privileges. *See* Doc. 44, Exs. M1, M2, M5-M13; Doc. 46, Exs. M3, M4; Doc. 124, Ex.1 (Deyhle Aff.).

**III. Analysis.**

    **A. Plaintiff's agreement to be bound by the Bylaws is enforceable.**

Plaintiff admits that he agreed to be bound by the Bylaws, including this section of the immunity provision: "there shall, to the fullest extent permitted by law, be absolute immunity from civil liability arising from any such act, communication, report, recommendation or disclosure, even where the information involved would otherwise be deemed privileged." He contends, however, without citing any legal authority in support, that the words "to the fullest extent of the law" limits absolute immunity to only those situations in which the protected individuals have not violated a law, including the Constitution, HCQIA, or New Mexico's Review Organization Immunity Act. *See* Doc. 199 at 9-11. The Court concludes that Plaintiff's interpretation is not a sound one. The provision provides absolute immunity from suit - not just from liability – and if interpreted the way Plaintiff argues, a person protected by the immunity clause would have to first undergo the burden and expense of proving at trial that he did not, in fact, violate one of these laws – which would negate the very purpose of the immunity provision. The words "to the fullest extent permitted by law" refers to the law of absolute immunity - *i.e.*, does federal and/or state law permit application of the principle in these circumstances. As discussed below, the Court finds that it does.

Plaintiff next argues that the immunity provision is unenforceable as unconscionable because it would violate the Constitution to require him to contractually waive his right to sue for a constitutional violation. *See* Doc. 199 at 12. But the immunity provision does not require Plaintiff to waive his right to sue Gila Regional for violating his constitutional right to due process – thus it

5

is not a blanket waiver of the right to file suit. And no plaintiff may twice recover for a single constitutional violation, so if the jury awards damages to Plaintiff under § 1983 for Gila Regional's violation of his due-process rights (which were accomplished by the acts of its MEC, FHC, and Board), he would not be entitled to additional damages from the individual defendants under § 1983.

Instead, the immunity provision protects **individuals** who are obliged to serve on various committees and/or to participate in disciplinary proceedings by giving opinions, overseeing, evaluating, recommending sanctions, and disciplining medical staff, which is a critical component of good health care. The immunity provision encourages physicians and experts to freely serve in these capacities by reducing the fear of suit for slander, defamation, or other torts, including constitutional torts, for having participated in these proceedings at the behest of Gila Regional. The United States Supreme Court has held that even broader agreements in which a party is required to *completely* waive his right to bring suit for constitutional violations in exchange for a benefit are enforceable, depending on the circumstances.

In affirming the enforcement of an agreement to completely waive the right to bring suit under § 1983 in exchange for the dismissal of criminal charges, the Supreme Court noted that,

> even when the risk of ultimate liability is negligible, the burden of defending []
> lawsuits [for violation of constitutional rights] is substantial. Counsel may be
> retained by the official, as well as the governmental entity. Preparation for trial, and
> the trial itself, will require the time and attention of the defendant officials, to the
> detriment of their public duties. In some cases litigation will extend over a period
> of years. This diversion of officials from their normal duties and the inevitable
> expense of defending even unjust claims is distinctly not in the public interest. To
> the extent release-dismissal agreements protect public officials from the burdens of
> defending such unjust claims, they further this important public interest.

*Town of Newton v. Rumery*, 480 U.S. 386, 395-96 (1987). The Court stated that bringing suit under § 1983 does not always vindicate the public's interests - rather, it vindicates the interests of the person who has allegedly suffered an injury. *See id.* at 395. The Court examined whether the person

challenging the enforceability of the agreement had personally benefitted from executing the agreement, *see id.*, and whether he had entered into it voluntarily – and not as a result of unfair overreaching by the prosecutor in the case, *see id.* at 398. Because the person challenging the enforceability of his agreement to waive the right to bring suit against officials voluntarily signed the agreement, received a personal benefit from signing it, and "enforcement of this agreement would not adversely affect the relevant public interests," the Supreme Court affirmed its enforcement. *See id.*

Applying those principles in this case, this Court concludes that Plaintiff's waiver of his right to file suit against the individual defendants by signing the agreement to be bound by the Bylaws is enforceable. It is not a blanket provision prohibiting suit against Gila Regional; it limits suing only individual staff members and third parties who participate in physician evaluation and discipline, thus it does not adversely effect important public interests. The public interest in encouraging physicians and third parties to frankly participate in these activities is an important one. Plaintiff signed the agreement in part in exchange for the privilege of working at Gila Regional with a guaranteed income of $22,500/month, so he received an enormous personal benefit from agreeing to be bound by the Bylaws. And there is no indication that Gila Regional was overreaching in requiring *all* of its medical staff to be bound by these Bylaws – which also promise due process in disciplinary proceedings – in exchange for granting medical privileges there. The Court concludes that the waiver is enforceable.

**B. The Bylaw's absolute immunity provision protects only those individuals who act in good faith, without malice, and with authority to act.**

Where, as here, an individual defendant raises absolute immunity or waiver as an affirmative defense, it is the defendant who "bears the burden of showing that such immunity is justified for the

function in question." *Howards v. McLaughlin*, 634 F.3d 1131, 1140 n. 6 (10th Cir. 2011) (internal quotation marks omitted); *United States v. Simons*, 129 F.3d 1386, 1389 (10th Cir. 1997) ("In the face of an affirmative defense that the action was barred, the government had the burden of proving the validity of a waiver of the statute of limitations").

As Defendants note, the "Bylaws provide absolute immunity from civil liability to 'members of [GRMC's] Medical Staff[,] . . . its Board of Trustees, . . . [or] third parties' who made communications, reports, or recommendations, or performed acts, in good faith and without malice, in connection with the corrective action, hearings, or reviews for 'the purpose of achieving and maintaining quality patient care at [GRMC]." Doc. 206 at 2 (brackets in original).

**1. Dr. Remillard and Dr. Koury are not entitled to absolute immunity because they extended the PRC investigation without authority to do so.**

It is established that the MEC expressly limited the PRC investigation to laparoscopic procedures on November 17, 2008, and it expressly found that Plaintiff's surgical skills did *not* need to be investigated. *See* Doc. 160-6. Dr. Remillard and Dr. Carreon, both members of the PRC, were at that meeting. *See id.* Nevertheless, Dr. Remillard, Dr. Koury, Dr. Carreon, and Dr. Montoya[3] unilaterally reached out to investigate not only the Plaintiff's laparoscopic-surgical patients's records, but to examine 32 more records that also involved general surgery and obstetric patients, without obtaining authority to do so. The Bylaws grant absolute immunity only for those acts and communications made "at the request of an authorized representative of this or any other health care facility." Doc. 196, Ex. D at 3-4. Although Dr. Remillard sought to justify the panel members'

---

[3] At the hearing, Dr. Remillard was vague in testifying that "probably four or five" physicians engaged in the review of over 30 of Plaintiff's patients' records, Doc. 44-2 at 9, but all reviewers remained anonymous on the evaluation sheets they filled out.

8

decision to extend the investigation without authority to do so, neither he nor Dr. Koury are entitled to absolute immunity for that behavior that violated Plaintiff's rights under the Bylaws.

### 2. Dr. Sergeant is absolutely immune from suit.

Plaintiff argues that the individual Defendants do not have absolute immunity because they did not act in good faith or without malice. He contends that the Defendants initiated the peer-review process not out of a concern for quality patient care, but to shield Dr. Nwachuku "from potential liability and to protect his economic interest." Doc. 199 at 3. As support for his contention, Plaintiff points to the facts that MEC member Dr. Nwachuku, who was the surgeon who wielded the scalpel in the surgery in which patient number 41872's[4] bowel was perforated, has never been subjected to peer review, while this event provided a major reason for subjecting Plaintiff, who served only as Dr. Nwachuku's assistant in that surgery, to the initial peer review. *See id.* at 3-4. Plaintiff also points out that Dr. Nwachuku did the follow-up care on patient number 196208 after Plaintiff apparently perforated her bowel, and that Dr. Deyhle, who reviewed the case in February 2009, stated, "complications can happen with surgery, so I can't criticize MD unless he has a trend of similar complications. Dr. Nwachuku, I believe, should have called surgery sooner." Doc. 44-7 at 24, Ex. M7 at 1. Plaintiff points out that, although Gila Regional's own outside expert questioned Dr. Nwachuku's performance in that case, Dr. Nwachuku has never been peer reviewed for his negligence in the other major case supporting the decision to investigate Plaintiff. And finally, Plaintiff points out that, after MEC members criticized Plaintiff for scheduling patient number 76636 for exploratory surgery and secretly used that as a basis for instigating the peer review, that no one objected to Dr. Nwachuku performing the same surgery a month later.

---

[4] I detailed the undisputed factual scenarios of this patient and of patients number 196208 and 76636 in my March 27, 2012 Opinion. *See* Doc. 94 at 13-14, 24 & n. 13, and 25-26.

In their reply brief, the Defendants first incredibly contend that Dr. Nwachuku was not Plaintiff's competitor, but was, rather, his employee, so they could not have been attempting to protect his economic interests by ordering a peer review. But Plaintiff has presented absolute proof that Dr. Nwachuku, the head of obstetrics at Gila Regional and one of only four MEC members who voted to start the peer-review process on November 17, 2008, was not Plaintiff's employer and was his only competitor as a board-certified surgical gynecologist and obstetrician, although Plaintiff admits that Defendant Dr. Koury also performed obstetrical services. *See* Doc. 199 at 27, Ex. UUU (Dr. Nwachuku's deposition swearing that Plaintiff was not his employee; that Plaintiff provided services for the hospital; and that Dr. Nwachuku had a contract with Gila Regional to allow Plaintiff to work out of Dr. Nwachuku's office building); Doc. 199 at 17 n.4 (stating that Dr. Koury, head of the PRC and a voting member of the MEC and head of the MEC on December 29, 2008, also exercises obstetrical privileges at Gila Regional).

Defendants next contend in their reply brief that "there is no evidence that Dr. Nwachuku participated in any way in the post-deprivation review of Plaintiff's privileges." Doc. 206 at 3. But their contention again is clearly belied by the documentary record. *See* Doc. 160-7, Ex. G (Minutes of November 24, 2008 MEC meeting at which Dr. Nwachuku participated as a voting member, and at which the MEC decided to continue the first suspension of privileges without interviewing Plaintiff or giving him the basis for his suspension, and imposed harsher new suspensions and requirements and recommended sanctions). The Plaintiff has shown, therefore, that Dr. Nwachuku could have had a selfish motive for wrongfully accusing Plaintiff of placing patients in imminent danger - displacing suspicion from his own potential malpractice and getting rid of his only competitor.

And Plaintiff contends that a jury could infer from the individual MEC, FHC, and Board

members' obvious and glaring failures to follow the due-process requirements of the Bylaws that the Defendants acted in bad faith and with malice.

> I have also previously found, based on undisputed documentary evidence, that
>
> there were ten "active" physician members of the MEC on November 17, 2008 (the first "emergency" MEC meeting, at which Plaintiff's abilities were questioned), including Dr. Nwachuku (the only other practicing OB/GYN in town and the physician with whom Plaintiff practiced) . . .[that] only 4 of the 9 active members entitled to vote were present at this first meeting: Drs. Nwachuku, Carreon, Sergeant, and Snure[;] . . . that it appears that Dr. Nwachuku did not inform the other three voting members of the MEC at that meeting that he – and not Plaintiff – was the lead surgeon in the first instance of perforated bowel[; and that t]he MEC committee members, three of whom performed surgeries of various sorts, agreed that "the outcomes for [Plaintiff's] open surgical cases was considered not to need review." *Id.* Thus, they voted to summarily suspend only Plaintiff's right to perform elective laparoscopic procedures for 14 days, and required Dr. Nwachuku to assist Plaintiff on emergency laparoscopies during that 14–day period.

December 21, 2012 Opinion at 8-9.

The obvious problem (which is not raised by the Defendants), is that the only voting member of the MEC present on November 17, 2008 that Plaintiff has sued in this case is Dr. Sergeant. Plaintiff is not suing Dr. Nwachuku, Dr. Carreon, or Dr. Snure. Dr. Remillard, although present at that MEC meeting, was not a voting member, and Dr. Koury was not present at that meeting. *See* Doc. 160-6. Neither Dr. Donnell, Don White, nor Dr. Deyhle were members of the MEC .

As noted, at that time, Dr. Nwachuku did not tell the other three physicians that he was the operating surgeon in one of the bowel-perforation cases. Further, it is clear that Dr. Deyhle, the outside expert hired in February 2009, had not opined at that time that Dr. Nwachuku was negligent in his follow-up care of patient number 196208, the second bowel-perforation patient. It is undisputed that the bowels of two patients had been perforated and that Plaintiff had performed laparoscopies on each of them. On the information apparently presented by Dr. Nwachuku – that Plaintiff had performed laparoscopies with "two complications [from bowel perforations] in the [5

11

to 6-week period of time]" March 27, 2012 Opinion at 12 (quoting Dr. Carreon's testimony about why peer review was initiated at the November 17, 2008 MEC meeting), there is no evidence to indicate that Dr. Sergeant acted either in bad faith or with malice in voting to *initiate* a peer investigation. Further, because Dr. Sergeant was not the head of the MEC at that time, even though the MEC members reviewed and discussed the Bylaws' requirements for summary suspension found in section 7.2 at the November 17 meeting, *see* Doc. 160-6, Dr. Sergeant cannot be charged with the apparently intentional failure to follow section 7.2-2's requirement that, within 5 days of issuing a summary suspension, the MEC must "interview the practitioner affected by the summary suspension," and inform him of its specific basis, including a written statement and summary "of at least one or more particular incidents giving rise to the assessment of imminent danger" "demonstrating that failure to suspend could have reasonably resulted in an imminent danger to the health of an individual." Doc. 44-1 at 11-12, Ex. J at ¶ 7.2-2.

Further, under the Bylaws, as the newly-appointed head of the MEC, Dr. Sergeant could not vote at the November 24, 2008 meeting unless there was a tie. However, there were only 7 other voting members present at the meeting, making a tie impossible, even though there is no record of a vote. Thus, he did not vote to continue the November 17, 2008 suspension, or to impose new suspensions and sanctions on November 24. Because Dr. Sergeant was not present and did not vote at the December 29, 2008 MEC meeting[5], he also did not vote to recommend that the Board ignore

---

[5] The Defendants make mostly conclusory statements in their motion, but they have adopted and incorporated pages 31-48 of their response (Doc. 160) to the Plaintiff's motion for summary judgment (which I granted in part in favor of Plaintiff and against Gila Regional, and which arguments I mostly rejected in my December 21, 2012 Opinion. *See, e.g.*, December 21, 2012 Opinion at 20 (rejecting their arguments regarding Dr. Montoya's testimony)). Those pages refer to a few pieces of evidence, like the one noting that Dr. Sergeant was not present at the December 29, 2008 MEC meeting, that indicate the absence of bad faith or malice, which I will discuss in this opinion.

12

the FHC's recommendations and impose even harsher sanctions on Plaintiff on December 29. There are no allegations that Dr. Sergeant individually did anything to defame Plaintiff or otherwise cause him emotional distress. I conclude, therefore, as a matter of law, that Dr. Sergeant is entitled to absolute immunity from all claims and he will be dismissed as a Defendant in this case.

### 3. Evidence of Dr. Remillard's bad faith.

I have previously found it undisputed that

> Dr. Remillard attended the MEC meetings [despite the fact that Gila Regional's Bylaws did not provide for or allow the CMO to attend those meetings]; . . . was a voting member of, and served as an "expert witness" for, the PRC; . . . served as the prosecuting individual on behalf of the MEC and as an unsworn witness at the fair hearing; and . . . served as a voting member of the quasi-judicial FHC at the fair hearing.

December 21, 2012 Opinion at 7 (Doc. 198); Doc. 160 at 13 ¶ 6 (listing the members and individuals authorized to attend the MEC meetings, which do not include the CMO). Surely, the CMO of a hospital should be familiar with its Bylaws and would understand that he could not represent the MEC and be both witness and judge against a physician in a "fair hearing," and it would be reasonable for a jury to infer bad faith and malice from Dr. Remillard's repeated decisions to disregard the Bylaws. I have also noted that, despite the fact that Plaintiff was never given the due process required in the Bylaws, and Plaintiff's two temporary suspensions had automatically expired by December 8, 2008 under operation of the Bylaws because of the MEC's failure to follow them, *see* December 21, 2012 Opinion at 13, and before the FHC had filed its decision to recommend rejection and modification of the MEC's November 24, 2008 summary suspension, "on December 17, 2008, Dr. Remillard wrote to the New Mexico Board of Medical Examiners to inform them of the suspensions of Plaintiff's privileges. Doc. 44, Ex. Q." March 27, 2012 Opinion at 29.

I have also previously noted, after comparing the undisputed facts presented at the fair

13

hearing and Dr. Remillard's December 29, 2008 testimony to the MEC summarizing those facts, that "it is impossible to see how, under the undisputed evidence presented at the [fair] hearing, Dr. Remillard could fairly tell the MEC that Plaintiff did not properly handle the complications caused by Dr. Nwachuku's surgery." December 21, 2012 Opinion at 18. In my Opinion denying Gila Regional's motion for summary judgment on the issue whether it and its agents and entities were immune from liability on Plaintiff's claims under HCQIA, on undisputed facts, I found:

> On March 4, 2009, Dr. Remillard submitted a report to the National Practitioner Data Bank, informing it of the Board's February 2, 2009 final "indefinite" suspension and reduction of clinical privileges. Doc. 44, Ex. G (44-1 at 2-5). But there are errors in Dr. Remillard's report, the most negative being that he erroneously stated that the results of "an outside peer review of selected cases" contributed to the Board's decision to taking its final adverse actions. *Id.* at 2. As the basis for the Board's action, Dr. Remillard also cited "substandard or inadequate skill level," "immediate threat to health or safety," and "substandard or inadequate care," *id.* at 3, when there has never been a final finding made by an expert, the Board, the MEC, or the FHC that, in fact, Plaintiff fell below the standard of care or that he is so incompetent that he poses an "immediate threat to health or safety." And Dr. Remillard did not check the box indicating that Plaintiff disputed the report. *See id.* Plaintiff has presented compelling evidence, therefore, "for a jury to conclude [Dr. Remillard's] report was false and the reporting party knew it was false." *Brown*, 101 F.3d at 1334.

March 27, 2012 Opinion at 33. There is abundant evidence for a jury to conclude that Dr. Remillard acted in bad faith and with malice when he acted and reported throughout these proceedings. He has not demonstrated an entitlement to absolute immunity on any of Plaintiff's claims against him.

### 4. Dr. Koury

As noted above, Dr. Koury, the MEC member who coordinated the PRC, extended the scope of the PRC investigation without authority to do so, thus he is not absolutely immune on Plaintiff's § 1983 claim as a matter of law. Further, regarding actions taken at the December 29, 2008 meeting, in which Dr. Koury (who was at this time acting Chief of Staff and the head of the MEC) obviously voted to break a 2-2 tie among the members present, I conclude that a jury could infer bad faith

and/or malice based on my prior factual summary of this meeting:

> The MEC held a special meeting on December 29, 2008 to discuss the FHC's recommendations. *See* Doc. 160, Ex. B. Only five voting members were present: Drs. Koury, Carreon, Snure, Stinar, and Arizaga-Morales. *See id.* Only Dr. Carreon had attended part of the fair hearing, and none of the members are OB/GYNs. Dr. Remillard presented the findings of the FHC and brought to the MEC's attention that many of the cases the PRC listed as a "5" in terms of bad outcome had been downgraded 3; and that Plaintiff was not the surgeon who perforated one of the patients' bowels. *See id.* . . . .
>
> . . . .After discussion, the MEC members indicated that their concerns were: "poor documentation; the need for in-depth continuous monitoring; and the need for further education." Doc. 160[-2], Ex. B. They made no findings that Plaintiff was so incompetent that he was placing patients in imminent danger. By a three-to-two vote, and despite the fact that neither the MEC, the FHC, nor any expert had ever made any findings that Plaintiff actually violated the standard of care for any patient; and, [d]espite the fact that Dr. Remillard, the only gynecologist on the FHC panel and Gila Regional's CMO, concurred in the FHC recommendations and signed off on them, the MEC sent a much harsher, more extensive set of recommendations to the Board that also affected Plaintiff's ability to practice obstetrics at Gila Regional. *See* Doc. 44, Ex. N at 1, 6. These recommendations included:
>
>> 1. Suspension of all gynecologic surgical privileges
>> 2. Obtain consultations for all obstetrical patients with medical or surgical complications and consultations for all Special Care Unit admissions.
>> 3. Send charts in question for outside review.
>> 4. Ongoing focused review of all obstetric patients.
>> 5. Six hours of Continuing Medical Education of Risk Management, including education on medical record documentation.
>> 6. Before GYN privileges reinstated, additional education with regard to the indications for and techniques of all gynecological surgery and receipt of information from an educator that Dr. Osuagwu is competent to practice in a small town. *Id.* at 1.
>
> *Osuagwu*, 850 F. Supp. 2d at 1236. The MEC gave no reasons in its minutes for ignoring the recommendations of the FHC, which was the **only** entity that had conducted a thorough review of the patient's charts and other hospital records, and the only entity that had heard Plaintiff's explanations. Nor did it give any reasons for recommending imposition of these new, extremely harsh requirements for reinstatement of privileges, the last of which, Plaintiff contends, would be virtually impossible for a licensed doctor to achieve. And this new set of recommendations contained new restrictions on Plaintiff's obstetrical practice that were never reviewed by the FHC before being sent to the Board.

December 21, 2012 Opinion at 17-19. But for Dr. Koury's December 29, 2008 vote that broke the tie in favor of the recommendations, the Board would have adopted the FHC's recommendations that the Board *reject* the MEC's November 24, 2008 suspension and requirements in favor of much less egregious ones. I, therefore, conclude that Dr. Koury has not met his burden to demonstrate that he is absolutely immune for these acts that violated Plaintiff's due-process rights or for the state-law claim for intentional infliction of emotional distress. *Cf. Borde v. Bd. of County Com'rs*, No. 10–2174, 423 Fed. App'x 798, 802, 2011 WL 1880963, *3 (10th Cir. May 18, 2011) (in case involving question of affirmative defense of absolute legislative immunity, affirming denial of summary judgment because the Defendants "do not explain how their participation, whatever it may have been, . . . qualifies as legislative activity" entitled to absolute immunity).

### 5. Dr. Donnell.

I have not previously found any evidence from which an inference of bad faith or malice could be drawn on the part of Dr. Donnell in these proceedings. He was not a member of the MEC or PRC. It is surprising that he did not require the MEC to support its suspension with testimony from the physicians and consultants who anonymously made negative comments about Plaintiff's performance, especially after Plaintiff objected to not being able to confront his accusers, but that alone does not support a finding of bad faith or malice. Plaintiff states that Dr. Donnell "falsely claimed" in his FHC report that

> "Dr. Osuagwu was present throughout the review process and gave sworn testimony during the proceedings. Twelve specific cases were presented to the panel along with the results of a thirty case random review. Dr. Carreon representing the Peer Review committee, gave a summary of the findings of that committee."

Doc. 199 at 7. There is nothing false, however, about those statements. The fair-hearing minutes reveal that 12 cases and the results of the PRC's 30-case review were, in fact, presented to the FHC,

16

but, as Dr. Donnell also explains in his report, the FHC discussed and reviewed only the serious cases and Plaintiff was given an opportunity to testify about each case they reviewed. *See* Doc. 44-3 at 7. Dr. Donnell stated in his report only that there was "evidence" to support bad judgment in a few cases – and never opined that Plaintiff did, in fact, use bad judgment; and he voted to reject the MEC's November 24, 2008 broad and harsh sanctions. Although the Defendants have done nothing to meet their burden to show that Dr. Donnell acted in good faith and without malice, it appears that there is nothing in the record from which reasonable jury could find that he did not act in good faith and without malice. Therefore, I conclude that he has absolute immunity and should be dismissed as a defendant.

### 6. Dr. Deyhle.

In my March 27, 2012 Opinion, I found that,

> according to the allegations in the second amended complaint, Dr. Ronald [Deyhle], a physician whom Gila Regional hired to conduct an independent outside review, did not engage in any of the peer-review actions set forth in this opinion or in the amended complaint, and his findings were not submitted to Gila Regional until after the Board had issued its final order imposing the permanent sanctions and discipline, thus it cannot be said that the Board relied on his opinions in imposing its sanctions.

March 27, 2012 Opinion at 1, n.1. Dr. Deyhle has submitted an affidavit confirming those findings. *See* Doc. 124-1, Ex. 1 at 1-2. There are no allegations that Dr. Deyhle discussed his findings with anyone other than officials at Gila Regional. Therefore, I conclude that there is no genuine issue of material fact that Dr. Deyhle acted in good faith and without malice in giving his opinion to Gila Regional as a third party after Gila Regional hired him as an expert. He is entitled to absolute immunity and should be dismissed as a Defendant. His separate motion for summary judgment (Doc. 124), therefore, is moot.

### 7. Don White

17

Don White, a member of Gila Regional's Board of Trustees, presided over the Board's February 4, 2009 meeting, at which the Board accepted the MEC's December 29, 2008, recommendations and permitted Dr. Montoya, a PRC member, to testify but refused to permit Plaintiff to cross-examine Dr. Montoya. In my December 21, 2012 Opinion, I set out other ways in which Mr. White, as the presiding Board member, failed to follow clear mandates of the Bylaws. *See* December 21, 2012 Opinion at 21-22. A jury could reasonably interpret these failures as bad faith on Mr. White's part. The Defendants have not demonstrated that he is entitled to absolute immunity.

**CONCLUSION**

The battles in this case have been significant and fierce. Although a trial date has not yet been set, the proposed Pretrial Order is due to this Court on or before February 19, 2013. It appears that this case may go to trial even though I have already entered judgment in favor of Plaintiff and against Gila Regional on the issue of liability for violating his constitutional right to due process. As Judge Chip Johnson often says, when a pro-se Plaintiff who is untrained in the law goes to trial against two large, very experienced law firms and four experienced defense lawyers, it is like showing up at a gunfight with a knife. Although he has managed to survive and get his evidence to the Court in a manner sufficient to survive to this point, the procedural and evidentiary rules of Federal Procedure are complex, and preparing jury instructions, presenting and cross-examining witnesses, and presenting evidence of damages in a trial can be perilous.

In his briefing, the Plaintiff, who is a native of Nigeria, has indicated that he was forced to dismiss his attorney in his state-court suits because he could no longer afford to pay him. It further appears that, until the Court recently ordered Gila Regional to reinstate his medical privileges and withdraw its negative reports from the National Practitioner Data Bank and the New Mexico

18

Medical Board, Plaintiff has been unable to obtain employment as a physician, and has been unable to do so since early 2009.  In these circumstances, and because I would like to avoid the judicial burdens and delays associated with pro-se trial litigation, I recommend that Plaintiff seek counsel to represent him for the trial of this matter.

  **IT IS ORDERED** that Defendants' *Motion for Summary Judgment* (Doc. 196) is GRANTED IN PART AND DENIED IN PART as set forth above;

  **IT IS FURTHER ORDERED** that Defendants Sergeant, Donnell, and Deyhle are entitled to absolute immunity and shall be dismissed as Defendants.

  **IT IS FURTHER ORDERED** that Defendant Deyhle's *Motion for Summary Judgment* (Doc. 124) is DENIED AS MOOT.

  **DATED** this 25th day of February, 2013.

_____
**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**

*Attorneys for parties*:
Dr. Chinonyerem Osuagwu, *pro se*
6240 Indian School Rd. NE, # B325
Albuquerque, NM 87110

*Attorneys for Defendant Gila Regional:*

Candace J Cavanaugh
Butt Thornton & Baehr PC
4101 Indian School Rd. NE, # 300S
Albuquerque, NM 87110

*Attorneys for the Individual Defendants*:

Kevin J. Banville
Seth Sparks
Shannon Sherrell
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Post Office Box 1888
Albuquerque, NM 87103